AUDIT CO. OF NEW YORK v. CITY OF LOUISVILLE et al.

(Circuit Court of Appeals, Sixth Circuit. February 7, 1911.)

No. 2,059.

1. APPEAL AND ERROR (§ 184*)—JURISDICTION—ADEQUATE REMEDY AT LAW—WAIVER OF OBJECTION.

Objection to jurisdiction in equity on the ground of adequate remedy at law, unless the case is without color of equitable jurisdiction, is waived if not raised in the trial court and will not be considered by an appellate court on its own motion.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1179-1183; Dec. Dig. § 184.*]

2. MUNICIPAL CORPORATIONS (§ 57*)—POWERS AND FUNCTIONS—ACTS RELATING TO MUNICIPAL PROPERTY.

Where a city is exercising the rights of a proprietor in the management of its property, its powers are not so strictly limited as when acting in its governmental capacity, but its council and officers resemble the directors and officers of a private corporation, and in large degree the powers of these agents and the responsibility of the city for their acts are governed by the rules applicable to private corporations.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 144, 148; Dec. Dig. § 57.*]

3. MUNICIPAL CORPORATIONS (§ 214*)—CONTRACTS—POWERS OF COUNCIL.

A city had for several years owned all of the stock of a private water company which had been purchased from its sinking fund, and, as a preliminary step to the formal taking over of the property and operating it as a city department, its council by a joint resolution directed an investigation of the company and authorized the employment of experts and accountants for the purpose. Held that, although such action involved the expenditure of money raised by taxation, it was not governmental, but was the act of a proprietor with respect to property acquired for business and not governmental purposes, and that as such the delegation of authority by the resolution to the mayor and a commission to contract for the work directed to be done was within the powers of the council.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 588; Dec. Dig. § 214.*]

4. MUNICIPAL CORPORATIONS (§ 214*)—CONTRACTS—RATIFICATION.

Such contract was furthermore validated by ratification where, after it was reported by the mayor, and at his request, the council by formal ordinance appropriated a sum of money for the payment of the liability thereby incurred.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 588; Dec. Dig. § 214.*]

5. MUNICIPAL CORPORATIONS (§ 217*)—CONTRACTS—VALIDITY.

Under a provision of a city charter that "all officers or agents of the city in any of its departments not herein required to be otherwise elected or appointed shall be elected or appointed in such manner as may be prescribed by ordinance," where the council by resolution authorized the mayor to appoint two commissioners and to employ clerical, accounting, and expert assistants to investigate and audit the affairs of a private

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

water company, the capital stock of which the city had purchased, a contract made with an audit company to furnish such assistance, signed by the mayor, was not invalid because there was no ordinance prescribing the mode of appointment of the commissioners.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 576; Dec. Dig. § 217.*]

6. MUNICIPAL CORPORATIONS (§ 867*)—CONTRACTS CREATING INDEBTEDNESS—CONSTITUTIONAL PROVISIONS.

Const. Ky. § 157, which provides that "no city * * * shall be authorized or permitted to become indebted in any manner or for any purpose to an amount exceeding in any year the income and revenue provided for such year without * * * an election * * * and any indebtedness contracted in violation of this section shall be void," is to be construed with reference to the time of contracting the indebtedness, and not with reference to the time when authority may have been given to an officer to contract an indebtedness at a future time, which authority might or might not be exercised.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1841; Dec. Dig. § 867.*

Constitutional and statutory limitations of municipal indebtedness, see note to City of Helena v. Mills, 36 C. C. A. 6.]

7. MUNICIPAL CORPORATIONS (§ 868*)—CONTRACTS—STATUTORY PROVISIONS.

A provision of a city charter that "no executive board, officer or employé thereof shall have the power to bind the city by any contract or agreement or in any other way to any extent beyond the amount of money at the time already appropriated for the purpose of the department under the control of said board" is a limitation on the powers of the executive boards and officers and has no application to a contract made by the council through a specially authorized officer.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1842; Dec. Dig. § 868.*]

8. MUNICIPAL CORPORATIONS (§ 214*) — CONTRACTS — CONSTITUTIONAL PROVISIONS.

Const. Ky. § 162, providing that no city "shall be authorized or permitted to pay any claim created against it under any agreement or contract made without express authority of law," does not render invalid a contract of employment made by express authority of a city council acting within its conceded powers.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 582–588; Dec. Dig. § 214.*]

Appeal from the Circuit Court of the United States for the Western District of Kentucky.

Suit in equity by the Audit Company of New York against the City of Louisville and others. Decree for defendants, and complainant appeals. Reversed.

The Louisville Water Company, a private corporation, was the source of water supply for the city. The city invested some of its sinking fund accumulations in the stock of the Water Company, and later, in the same manner, became the owner of all the stock of the Water Company. This last situation had continued for 16 years, when, in 1906, the Legislature passed an act providing for the creation of a water department in the city government, and the taking over of the property of the corporation. Acts 1906, c. 16. Pending such taking over, and on August 27, 1907, the city's general council, which is composed of two houses, a board of aldermen and a board of council, passed, in each, a joint resolution directing an investigation of and report upon the affairs of the Water Company, and for that purpose authorizing the mayor to appoint a commission of two members and to employ clerical, accounting, and expert

assistants. On September 3, 1907 (but with the recited date, August 31st), the mayor and the two commissioners appointed by him entered into a contract in writing with the Audit Company, by which it was employed to make such investigation and report. It agreed to do the work rapidly by employing a large number of assistants, and by the contract it was to receive a stated per diem for each one of its employés engaged; the per diem varying according to the position of the person employed. It was also to receive the traveling and hotel expenses of its employés. The Audit Company began its work on September 3d, and by the mayor's direction its investigation covered a period of 17 years. It employed therein an assistant manager and a chief accountant and a force of 35 accountants and stenographers. They worked continuously, night and day, in shifts, and completed their investigation and report on November 10th.

For these services and some later items, the Audit Company rendered an itemized bill of about $38,000, made up of about $27,000 for the per diems, and about $11,000 expenses. The city, upon the grounds hereinafter stated, refused to pay, and the Audit Company filed its bill asking to reform the contract by changing the stated date, August 31st, to the true date, September 3d, and asking, in connection with such reformation, a money decree for the amount claimed. On final hearing, the bill was dismissed, and complainant appeals.

J. S. Auerbach, Charles H. Tuttle, and W. W. Crawford, for appellant.

C. B. Blakey, for appellees.

Before SEVERENS and KNAPPEN, Circuit Judges, and DENISON, District Judge.

DENISON, District Judge (after stating the facts as above). The subject of the jurisdiction of a court of equity should not pass without notice. It might seem that, in an action at law upon the contract, the true date could be shown, and so the legal remedy would be adequate. District of Columbia v. Camden, 181 U. S. 453, 461, 21 Sup. Ct. 680, 45 L. Ed. 948. It was complainant's theory that the date was not, as often, immaterial, but was an important and perhaps controlling fact, because August 31st and September 3d were in different fiscal years, and obligations incurred during one year must be within the tax limit for that year. Defendant, by general demurrer, raised the point that the "bill was without equity," but not specifically that the legal remedy was adequate. The district judge, overruling the demurrer, considered the importance of the true date as bearing on the right to reform in equity, but did not consider, and, apparently, did not have brought to his notice, the more determinative question whether the true date could not be shown at law just as well as in equity. In the final decree, the court declared the existence and the materiality of the mistake and a reformation of the contract. In this court, defendant has not, by brief or oral argument, urged the lack of equitable jurisdiction as any ground of supporting the decree dismissing the bill.

The reason of the rule, which requires the objection of adequate legal remedy to be raised before proceedings have been had which would be unnecessary if the objection was good, would seem also to require it to be maintained at every stage of the case where it might be controlling, and we regard the defendant's action here as tanta-

mount to a waiver; nor is the case so "plainly unsuitable to the exercise of the jurisdiction of a court of equity" nor so wholly without "color of equitable jurisdiction" as to justify this court, after such waiver, and on its own motion, in affirming the decree upon this ground. Toledo, etc., Co. v. Computing, etc., Co. (Sixth Circuit) 142 Fed. 919, 923, 74 C. C. A. 89; Warmath v. O'Daniel (Sixth Circuit) 159 Fed. 87, 91, 86 C. C. A. 277, 16 L. R. A. (N. S.) 414.

Before considering the city's various reasons for denying liability, it is to be noted that the contract was one which the general council had full power to make. No question of ultra vires, in the broad sense of that phrase, is involved. The objections to be considered go only to the manner of exercising or the conditions precedent to exercising an admitted power.

It also becomes important to classify the joint resolution as being, on the one hand, governmental, or, on the other hand, proprietary, because different rules of validity are applied to the two classes of municipal action. The general rule is well established that, where a city is exercising governmental powers, it is closely limited, and clear authority for each such action must be found in the controlling general or special law of the state, but that, when it is exercising the rights of a proprietor in the management of its property, its council and officers resemble the directors and officers of a private corporation, and, in large degree, the powers of these agents and the responsibility of the city for their acts are governed by the rules applicable to private corporations. South Carolina v. U. S., 199 U. S. 437, 462, 26 Sup. Ct. 110, 50 L. Ed. 261; Pike's Peak Co. v. Colo. Spgs. (Eighth Circuit) 105 Fed. 1, 11, 44 C. C. A. 333; Henderson v. Young, 119 Ky. 224, 83 S. W. 583.

Whatever may be the situation since the city, in 1908, formally took over the Water Company, and made it a city department, the city's action of 1907, now under consideration, was clearly of the proprietary character. As a proprietor, it had owned, for 17 years, the capital stock of a private corporation, and it was considering changing the form of management. It desired to have full information about its property, in order to know the present value and to learn what, if any, special facts in its history, required action. For this purpose, it desired an investigation and audit, and employed experts for this purpose. We find nothing whatever governmental in this action, and whether it be treated as an investigation of property which the city had long owned, or an inquiry into property the purchase of which was under consideration, in either case it was the act of a proprietor with regard to his present or prospective property, and has no other aspect.

The Court of Appeals of Kentucky has passed upon the very question, and has directly held that, in its ownership and control of this property, through the ownership by the Sinking Fund Commission of the Water Company's capital stock, the city of Louisville was acting in its private, and not in its governmental, character. This conclusion has been stated in three cases, one of which considered the act of 1906. Clark v. Louisville Water Co., 90 Ky. 522, 14 S. W. 502; Louisville v. McAteer, 81 S. W. 698, 26 Ky. Law Rep. 425, 1 L. R. A.

(N. S.) 766; Bell v. Louisville, 32 Ky. Law. Rep. 700, 106 S. W. 862.

The fact that the money to be expended was money raised by taxation cannot be controlling. We are concerned with the character, private or governmental, of the disbursing act. Every contract by a city to buy property which is not needed for governmental purposes involves the expenditure of tax money, yet in such cases the act of purchase is none the less proprietary. The present case furnishes an illustration, as the money invested by the Sinking Fund Commission in the Water Company's stock must have been public tax money, and this investment has been, in the above cases, held to have been the act of a proprietor not of a government.

We proceed then to consider the contract in question from the view point that it was within the power of the council and that it pertained to the management of the city's nongovernmental property, and, from that view point, to examine the city's objections separately.

1. The first objection is that the joint resolution undertook to delegate to the mayor or to the mayor and commission nondelegable powers, and the rule of Lowery v. Lexington, 116 Ky. 157, 75 S. W. 202, and Bowling Green v. Gaines, 123 Ky. 562, 96 S. W. 852, is urged in support of the objection. These cases both involved matters pertaining to governmental functions, one to the collection of taxes, the other to the construction of sewers; and to a delegation of such powers by a municipal corporation the strict rule of prohibition applies. On the other hand, duties of an administrative character, and especially when pertaining to the management of the city's privately held property, are not within the rule nor the reason of the rule that forbids delegation. Dillon on Munic. Corp. (4th Ed.) vol. 1, p. 156; and see cases cited above re distinction between classes of powers. On these principles, we see no reason why the council could not authorize the mayor alone, or with associates, to employ clerical or expert help for the purpose in question.

This objection is further answered by an application of the principles of ratification. An imperfectly performed governmental act can perhaps be ratified only by observing the strict conditions essential in the first instance; not so where the act in question is of the proprietary character here involved; and a sufficiently clearly expressed intent to approve and ratify would cure any lack of power in the original delegation. It appears, by the undisputed testimony, that on September 3d the mayor explained to the finance committee of the council the necessity that the expense of this examination should be provided for, and requested that $25,000 should be set apart for that purpose; that thereupon the customary and the then contemplated appropriation of $5,000 for incidental expenses for the quarter then commencing was raised to $30,000; that this appropriation was given full effect by formal ordinance finally passed on September 13th; that the purpose of increasing the appropriation "was understood by the city administration and by the finance committee and by the members of both boards, and was published in full in the newspapers at the time"; and that on October 29th the mayor sent to the council, in writing, a statement that the Audit Company had 28 men employed upon this

185 F.—23

work, and that it would be continued until the 10th of November. From the silence of the council after this communication, and from its action in making an appropriation to meet the expense of this contract, we think a ratification sufficiently appears. If, when making the appropriation, it knew the details of the contract, the conclusion of ratification would be inevitable, and it is not less so if the council knew only that the mayor had employed the Audit Company under a contract of this general character and if it failed to get all details only by not asking for them.

2. The next objection is that section 2780, Ky. St. (Russell's St. § 568) requires that "all officers or agents of the city, in any of its departments not herein required to be otherwise elected or appointed, shall be elected or appointed in such manner as may be prescribed by ordinance"; that by section 2777 (section 565) an interval of a day must elapse between the action of the two houses of the council upon an ordinance; and that, as the joint resolution was passed by both houses the same evening, it could not have validity as an ordinance, even if its form as a resolution could be disregarded.

Observing that the nature of the employment was not changed by giving to the persons to be employed the dignified name of "commissioners," and that, as they were chosen for a specific and temporary purpose, there was no occasion to "prescribe" by permanent ordinance "the method of their appointment," it is not clear that the section has any application to the commissioners themselves (Lowry v. City of Lexington, 113 Ky. 763, 772, 68 S. W. 1109); but it is not necessary to decide whether the commissioners, as to some of the duties imposed on them personally, might be considered "officers or agents" within this provision. The contract with the Audit Company derives its validity from the action of the mayor, not from the signatures of the commissioners. By the terms of the resolution (section 2), the mayor is authorized: (1) To appoint and employ the commissioners; and (2) to employ such other persons as may be necessary to render assistance. The commissioners co-operate in determining whether assistance, and how much assistance, is necessary; but the act of employment is the act of the mayor, and the mayor is, certainly, not an "officer or agent" within this section, because his election is elsewhere specified.

A further answer to this objection is found in the proprietary character of the act in question. The limitations of the section do not apply to agents of the city in its proprietary character.

3. The third objection is based on the Kentucky Constitution which, by section 157, declares that:

"No city * * * shall be authorized or permitted to become indebted, in any manner or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year, without * * * an election, * * * and any indebtedness contracted in violation of this section shall be void."

We think it clear that this prohibition is to be construed with reference to the time of contracting the indebtedness, and not with reference to the time when authority may have been given to an officer

to contract an indebtedness at a future time, which authority might or might not be exercised. The contract in this case was not made until after the commencement of the fiscal year, September 1, 1907, and it was not for an amount exceeding the income and revenue provided for that year. It is true the resolution authorizing the contract to be made was passed during the previous year; but this resolution did not create nor purport to create any indebtedness or liability, and no liability of the character herein involved could come into existence until the mayor acted by making a contract of employment. The declaration of intention to charge the revenues beginning September 1st, the making of the contract on September 3d, and the ratification of September 3d and of September 13th, all support the conclusion that the liability should be considered as having been created in the later period. We find nothing in any of the Kentucky decisions cited which is inconsistent with this construction of the constitutional provision. In Ramsey v. Shelbyville, 119 Ky. 180, 83 S. W. 116, 1136, 68 L. R. A. 300, the ordinance, although it did not take effect until a future date, did create ipso facto a definite, fixed obligation to become due through the series of later years. So, Knipper v. Covington, 109 Ky. 191, 58 S. W. 498, and Beard v. Hopkinsville, 95 Ky. 239, 24 S. W. 872, 23 L. R. A. 402, 44 Am. St. Rep. 222, have to do with contractual obligations presently incurred but the maturity of which is postponed; and they hold only that the constitutional provision cannot be avoided by making the debt payable in the future. They do not hold that a city cannot make a continuing plan or give continuing authority which will be operative in future years upon the revenues of each year to the extent that it first becomes a contract liability during such year.

4. The next criticism is that no appropriation for the expenses involved in the contract had been made before the contract was executed; and to support this objection section 2820 and section 2821 (Russell's St. §§ 604, 605) are cited. Section 2820 is as follows:

"No executive board, officer or employé thereof shall have the power to bind the city by any contract or agreement or any other way to any extent beyond the amount of money at the time already appropriated for the purpose of the department under the control of said board."

Section 2821 makes it an offense punishable by fine and imprisonment for any city official to attempt to bind the city by contract to any extent beyond the amount of money at the time appropriated by ordinance for such purpose and remaining unexpended.

Section 2820 seems plainly to refer only to the act of an executive board or its representatives, and is for the purpose of compelling the boards to keep within their appropriations; it does not have any reference to the acts of the general council. The same consideration makes section 2821 irrelevant, as it relates to the act of a city official, acting within the scope of his ordinary powers, and does not bear upon the power of the general council, acting itself or acting by the hand of a specially authorized city official.

If we look for the limitations upon the powers of boards and officers carrying on the regular business of the city, we find the limitations in these two sections; but the only limitation upon the city itself and

·upon the general council as its representative is found in section 157 of the Constitution.

5. The city relies upon section 162 of the Kentucky Constitution, which provides that no city "shall be authorized or permitted to pay any claim created against it under any agreement or contract made without express authority of law."

The conclusions which we have reached, to the effect that this contract was duly made pursuant to the action of the general council, and that such action and such contract are not open to any of the objections urged against them, taken in connection with the concession that the general council did have full power to make such a contract, lead to the conclusion that it is supported by "express authority of law."

It follows that the complainant is entitled to a decree for the amount earned under its contract. We will not undertake to decide what number of days' service and by what persons was reasonably necessary for the performance of the obligations of the Audit Company under the contract, nor what amount of expenses was reasonably necessary. We think the court below should first consider these questions. It may dispose of them upon the present record, or it may think proper to take additional proofs and have a further hearing before a master or before the court.

The decree below will be reversed, with costs of appeal to appellant, and the record remanded for proceedings in accordance with this opinion.

NOTE.—The following is the opinion of Evans, District Judge, in the Circuit Court:

EVANS, District Judge. The complainant, by this action in equity seeks: First, the reformation in respect to its date of an agreement in writing made with the defendant, upon the ground that by the mutual mistake of the parties it was dated August 31, 1907, when in fact it was made on September 3, 1907, and should have borne that date; and, second, the enforcement of the contract when so reformed. The bill alleges that:

"By an act of the General Assembly of the Commonwealth of Kentucky, approved March 6, 1906, cities of the first class, to which said defendant city of Louisville belongs, owning waterworks or the capital stock of corporations operating same, as above described, were authorized to take unto itself the management of such enterprises, and, in pursuance of said act, said defendant city of Louisville did make radical changes in the management of said waterworks and install an entirely new set of officers to operate said waterworks, but said property was not finally transferred to said defendant city of Louisville, until a joint resolution of the general council of said city was approved on July 14, 1908."

With this condition of affairs existing, the general council of the city of Louisville, in joint session, passed a resolution which was thereafter on August 27, 1907, approved by R. W. Bingham, the then duly appointed and qualified mayor of said defendant city. Said resolution was as follows, to wit:

"Joint resolution of the board of council and board of aldermen, constituting the general council of the city of Louisville, providing for an examination of and report upon the affairs and accounts of the Louisville Water Company, and the city of Louisville's board of waterworks.

"Whereas, it is deemed advisable that there shall be an investigation of and report upon the affairs and accounts of the Louisville Water Company for such a number of years past as, in the judgment of the mayor and of the commissioner hereinafter appointed, may be deemed proper:

"Now, therefore, be it resolved by the general council of the city of Louisville as follows, to wit:

"Section 1. That there shall be an examination of and report to the general council of the city of Louisville upon the affairs and accounts of the Louisville Water Company and of the board of waterworks (said Louisville Water Company and board of waterworks to be hereinafter designated by the term 'Company' where the context of this resolution so demands or requires), including an examination into and report upon—

"(1) All the 'Company' sources and amounts of revenue and receipts of whatsoever nature.

"(2) The disbursement and distribution of such revenue or receipts, either through contracts, pay rolls or otherwise.

"(3) Any and all acts of said Company, its officers, agents or employés in the expenditure of money incident to the conduct of its business.

"(4) The prices charged to the citizens of Louisville for water as compared with cost of water to the citizens of other cities in the United States equally favorably situated.

"(5) The quality of the water so furnished with especial reference to the cost thereof as compared with that furnished in other cities in the United States.

"(6) The cost of the construction of the filter plant, contracts that have been made in relation thereto, and the probable time when it can be put into practical operation.

"Sec. 2. That the mayor of the city of Louisville be, and hereby he is, requested, authorized, directed and empowered: (1) To appoint and employ two persons (hereinafter termed the Commission) to make such examinations and report, and to employ such other persons as may be necessary to render stenographic, clerical, engineering or other expert assistance to the Commission in the prosecution of its labor as, in the judgment of the mayor and Commission, may be necessary or proper for the assistance of the Commission.

"Sec. 3. That the Commission shall have full access to all the books, accounts, contracts, vouchers, pay rolls and other papers of the Louisville Water Company and of the board of waterworks.

"Sec. 4. That the Commission shall have power to examine any officer, agent or employé of the company, or of the city of Louisville, or of any of its boards or departments, and to question them concerning any matter connected with the subject of the examination and report, and the failure or refusal of any one so examined to answer the questions of the Commission shall in itself be deemed sufficient cause for the discharge of such person so failing or refusing to answer from the employ of the Company or of the city of Louisville, or any of its boards or departments.

"Sec. 5. That the Commission shall, in its examination, extend back over such a period of time in the past as it and the mayor may deem necessary to secure full information for the accomplishment of the purposes of this resolution.

"Sec. 6. The expenses incurred in the employment of the Commission and of any other person or persons authorized to be employed hereunder, including any necessary traveling or other expenses, shall, under the direction of the mayor, be paid from the 'General Purposes' fund of the next ensuing year beginning September 1, 1907, and in the appropriation from such 'General Purposes' fund of the money sufficient to defray such expenses.

"The mayor shall, from time to time, report to the general council his action under this resolution and from time to time, as called on by the mayor, or by resolution of the general council, said Commission shall report the progress that it is making in such examination.

"Sec. 7. If any section or any sentence of this resolution shall be held void, that fact shall not affect any other section or sentence of this resolution, it being the intention of the general council in enacting this resolution to enact each section and each sentence separately.

"Geo. F. Allen, C. B. A.
"J. Geo. Miller, C. B. A.
"E. B. Kerr, P. B. C.
"John D. Otter, P. B. A.
"R. W. Bingham, Mayor.

"Approved Aug. 27, 1907."

It will be observed that the complainant avers in its bill that the general council at a "joint session" passed the joint resolution; but by amendment this phrase is withdrawn, and any effect it might have had need not be considered. The bill also avers that after the passage of the joint resolution the mayor "appointed and employed William Marshall Bullitt and Edward L. McDonald, who, with himself, were to compose the Commission provided for by section 2 of the joint resolution. Both of said appointees qualified as said commissioners and thereafter, with the mayor, composed said Commission."

The bill also avers that "said mayor and Commission, deeming it best to secure disinterested services from without the city of Louisville, on the 3d day of September, 1907, entered into a contract in writing with the complainant." The agreement is then set out as follows:

"Pursuant to the joint resolution of August 27, 1907, passed by the general council of the city of Louisville, appointing a Commission to investigate and report upon the affairs of the Louisville Water Company, the Audit Company of New York is hereby employed for and on behalf of the city of Louisville to make such investigation and report, and shall be paid for its work on the following per diem basis, plus all necessary hotel and traveling expenses.

"For the chief accountant in charge, $25.00 per diem; for each assistant accountant, $15.00 per diem; for each stenographer, $7.50 per diem; for each regular staff engineer, if employed, $25.00 per diem; for the services of the Philadelphia manager, when required, $25.00 per diem; and for the services of the general manager, when required, $25.00 per diem.

"If special engineers do other expert work on investigation which the Commission may desire to have done, they shall be paid for at such rates as may be agreed upon by the Commission and the Audit Company, and such experts shall assist and give all necessary information to enable such expert examination to be made.

"The Audit Company of New York agrees to put a sufficient number of its best and most experienced and competent accountants upon the work so as to press it to as speedy a conclusion as possible. The Commission shall have the right to require additional men to be put upon the work if it be necessary in order to hasten its completion.

"The Commission shall have the right at any time to terminate this contract.

"Witness the signatures of the Audit Company of New York by M. V. Buck, its Philadelphia manager, and the city of Louisville by its Commission, and by the mayor, this 31st day of August, 1907.

"City of Louisville,
"By William Marshall Bullitt,
"R. W. Bingham, Mayor,
"E. L. McDonald.
"The Audit Company of New York,
"By Walter V. Buck, Phila. Mgr."

It will be observed that this agreement is signed by the mayor as well as by the other parties, though it does not appear that the joint resolution contemplated that he should be one of the "commission." The "commission," by the express provisions of the joint resolution, was to consist of two persons to be appointed and employed by the mayor, and the commission thus constituted was authorized to employ such other persons as might, in the judgment of the commission, and the mayor, be necessary.

It is claimed by complainant that by the mutual mistake of the parties to the agreement it was dated August 31, 1907, when in fact it was intended to be dated September 3, 1907, it not having been entered into until that date, although one of the persons who signed it without the presence or knowledge of the others had, on August 31st, made the original draft of it, and the agreement bore that date only for that reason. The defendant in its answer raises an issue as to the mistake which we will dispose of at the outset. We have concluded from the testimony that a mutual mistake was made, and that it concerned a material matter. We therefore hold that the complainant has shown itself entitled to a reformation of the contract to the extent of changing its date from August 31, 1907, to September 3, 1907. Regarding it as so reformed, we proceed to consider other questions raised.

It does not appear that the general council of the city ever approved the agreement, or, in any way, passed upon it, or upon complainant's claims under it, though it is admitted by the answer and distinctly shown by the testimony that a full report of the facts was made to the general council by the mayor. Nor was any appropriation ever made to pay the claim arising under the agreement. After the agreement was executed, the complainant went vigorously to work upon the investigation, bringing to it from eastern cities a manager, a chief accountant, an engineer, and a force of accountants, stenographers, etc. (probably 25 or 30 persons in all), who, for about 70 days, worked industriously upon the books, accounts, papers, etc., of the Water Company, and finally made an elaborate and detailed report of its condition, its property, and its accounts. For this work the complainant computed its claim under the terms of the agreement to be $38,463.94, including therein the agreed daily compensation for the persons employed on the work, and $10,937.13 hotel bills and traveling expenses—mainly hotel bills. Judgment is asked against the city for $38,463.94, with interest from January 1, 1908. The city, upon various grounds, urged in its answer, and in the argument contests the complainant's claim, its validity, and its reasonableness.

1. For more than half a century previous to the act of March 6, 1906 (Sess. Acts 1906, p. 52), there had existed a corporation known as the Louisville Water Company. For over 12 years the city, through its board of sinking fund commissioners, had owned all of the capital stock of the Water Company, and through these instrumentalities was secured the performance of the great public duty of supplying water for all municipal purposes, for safeguarding the city against fires and dangers to the public health, as well as supplying water to the masses of the people for their private consumption. The net earnings upon the stock in the Water Company, if any, are applied to the payment of the liabilities of the city pursuant to various statutory provisions. By the act referred to the manner of controlling, managing, and operating the waterworks was regulated in cities of the first class. The provisions of the act required the mayor to appoint a board of waterworks, in which was vested, as a body corporate, all the authority, rights, powers, and privileges of the corporation, including the power of making contracts, and that of suing and being sued. This board, in effect, was charged with the duties and invested with the powers and rights of the Water Company. The city was given the free use of all the water it needed for public purposes, but private consumers were required to pay a reasonable rate for the water they used. The board of waterworks was to collect the rates due and pay all its obligations, etc., etc. It was also authorized to borrow money and to issue bonds. The general council of the city was given power to fix, by ordinance, reasonable terms and conditions upon which the board of waterworks might exercise its rights to cut the streets. In short, the new corporation named the Board of Waterworks was to take the place of the Louisville Water Company. By its express terms the act became effective on the date of its approval, to wit, March 6, 1906. Louisville is the only city of the first class in Kentucky, and therefore the act operated upon it alone. For some reason not clearly disclosed (though we may imagine that it was for the purpose of ascertaining whether it should exercise any right of election the city might have), the act was not in fact put into full operation until a joint resolution of the general council was approved on July 14, 1908, which, in effect, formally transferred to the board of waterworks the property of the Water Company. It is claimed that it was to enable the city intelligently to understand the situation before it acted that the joint resolution for appointing a commission to make an examination, approved August 27, 1907, was passed by the general council. This view necessarily treats the act of March 6, 1906, as an enabling act, rather than otherwise. But however we may view the act from that standpoint, by its express terms in section 5 it was provided "that nothing in this act shall in any way affect the provisions of subsection 13 of section 3010 of the Kentucky Statutes, which adds the stock owned by cities of the first class in its waterworks company to the resources of the sinking fund of such city." Subsection 13 of section 3010 (Russell's St. § 885) is as follows:

"There shall be added to the present resources of the sinking fund of said city the stock owned by her in the Louisville Water Company. The commis-

sioners of the sinking fund shall have the power to purchase from individuals holding the same the certificates of stock. held by said individuals in the Louisville Water Company, and when so purchased shall be held by said commissioners as a part of the sinking fund of said city."

In subsection 1 of the same section (section 873) it is provided:

"The sinking fund to pay the bonded debt of the city is hereby continued as now established by law, and shall consist of the mayor, the president of the board of aldermen for the time being, and three persons to be chosen on joint ballot, as hereinafter directed, and they and their successors in office shall continue to constitute the 'commissioners of the sinking fund of the city of Louisville,' and by that name shall continue to have corporate powers and existence, may sue and be sued, and do and perform all things necessary to execute the duties required and powers given them by this act."

And by subsection 8 (section 880) it is provided that "the sinking fund shall be under the control and management of the commissioners of the sinking fund, and shall be held and sacredly used for the payment of principal and interest of the bonded debt of the city."

It will thus be seen that while the city could, through the power of election or appointment of their officers, in large measure control the affairs of the commissioners of the sinking fund as well as those of the Louisville Water Company, the interest of the city in the latter was made one of the resources of the sinking fund. The act of 1906 authorized the transfer or ex proprio vigore transferred to the board of waterworks the corporate property of the Water Company. In practical effect it changed the name and management of the Water Company, whose entire capital stock was owned by the city through its commissioners of the sinking fund. It follows that the city had an interest in the question whether the act of 1906 should be accepted (if any option in the premises existed), and it might well be that the city had the desire and the right to seek information to enable it to act intelligently. Probably this general proposition would not be denied; but the question is whether the city could lawfully proceed to acquire such information by the method adopted, though, if it might lawfully proceed at all, the precise method by which it might do so is not specified in the statutes, unless by the sections presently to be noticed. The "commissioners of the sinking fund," which, as we have seen, is a body corporate, had an interest in the question, and might, at its own expense, have taken steps to enlighten itself upon the proposition. For like reasons, and in the same way, the Water Company might have done the same thing. The city, in the broad sense, dominated both, and might have compelled either of these subordinate corporate agencies to do it, but it does not appear that the city or either corporation did anything in that way. The general council and the mayor proceeded on other lines.

2. It is claimed that Messrs. Bullitt and McDonald were appointed members of the Commission by a mere oral communication to them, and it is urged that a written warrant, commission, or certificate of appointment was essential to their investment with any authority in the premises. The statutes contain an applicable provision. The then mayor has testified to the strong impression that the appointments were made in writing, and in the absence of clear testimony to the contrary, the presumption would be indulged that he had done whatever was his duty in the premises as to the manner of making the appointments.

3. The objection is made that neither Mr. Bullitt nor Mr. McDonald took an oath of office. Section 2745 of the Kentucky Statutes (Russell's St. § 535) provides that "the members of the general council and all other officers of the city, before entering upon the duties of their respective offices, shall take such oath or affirmation as may be prescribed by this act or by ordinances."

If the commissioners were not officers within the sense of this provision, no oath was required by its terms. No ordinance prescribing an oath in case of such appointees, nor indeed of any other, has been produced. The act referred to in the section was the act of July 1, 1893 (Laws 1891—92—93, c. 244) which now is the chapter on Municipal Corporations in the Kentucky Statutes, and in which is embraced section 2745, as well as a great many others. We do not find in that act, nor in that chapter, any oath prescribed for the members of such a commission, although oaths are prescribed for vari-

ous specified officers. We do not find it necessary to determine whether the joint resolution created "offices" in the technical sense, though, as the two appointees it provided for were to be "appointed and employed" to constitute a "commission," the question is by no means free from doubt. The word "appoint" appropriately and usually refers to offices, while, if a person is to be employed in some capacity outside of an official one, the word "employed" would more probably be used. Here, both words are used.

4. Section 2797 of the Kentucky Statutes (Russell's St. § 651) provides that "the mayor shall, as often as he may think proper, appoint not more than three competent persons to examine, without notice, the affairs and accounts of any city department, trustee, officer or employé, and the money, securities and property belonging to the city in the possession or charge of such department, trustee, officer or employé, and to report to him the result of such investigation." The statute in section 2743 (section 533) provides that there shall, in cities of the first class, be a legislative, an executive, and a judicial department, each of which shall be separate from the others. Other sections provide for a fire department and for certain executive boards. The language quoted from section 2797 is quite broad, and most probably was meant to be very comprehensive, and to provide a way, whenever the mayor should think it necessary, for a prompt investigation into the accounts and property and affairs of anything in which the city had an interest, or over which it had control. We incline to think the provisions of the section would extend to an examination of the affairs of the Water Company as one of the important concerns of the city, whether or not the meaning of the words "city department" is susceptible of an exact definition when we consider all the provisions of the chapter on Municipal Corporations. The section authorizes the mayor at any time he may think proper to appoint not more than three competent persons to do certain work. We incline to think that the section, properly construed, does not limit the number to three persons in one year or in one mayoralty term, but that it authorizes the mayor at any time to appoint not over three competent persons to make any necessary examination. We suppose that it cannot be doubted that this section provides for emergencies, and that an emergency in one department might occur when there was also an emergency in another, and that it was intended, inasmuch as these appointments were for temporary purposes, that they might be made for one department though an examination was then going on in another. But, however this may be, the section does not, in terms, authorize the appointment of a "commission" as such, and, all things considered, we doubt if the word "persons," used in the section, was intended to mean other than natural persons. We doubt if it was contemplated that, by the appointment of a corporate body to make an examination, the city could be charged with the expenses of an indefinite and possibly a large number of natural persons employed by that corporate body to do the work which it was supposed a limited number of individual accountants might promptly accomplish. We therefore conclude that it is immaterial to the determination of the questions before us that the mayor had theretofore appointed Messrs. Merriwether, Banta, and Fuchs as competent persons to make certain other examinations.

5. The Legislature of the state has not seen fit to declare the particular mode or proceeding by which the general council of a city of the first class shall exercise its legislative functions—whether by bill, joint resolution, or ordinance. What it has enacted on the subject is in part contained in section 2777 of the Kentucky Statutes as follows:

"No ordinance shall be passed until it shall have been read in full in each board and free discussion allowed thereon, and no ordinance shall pass both boards on the same day."

Nothing has been enacted to show that if a commission like the one in question is to be created, and an expense to the city thereby incurred, it is possible, by calling the legislation a "joint resolution" to evade the need of separate action on different days by the two boards. True, the provisions of the section are in terms limited to "ordinances," and the statute in no way expressly provides that a joint resolution may not be passed by the general council. But, though otherwise entitled, a joint resolution, at least in congressional usage, is a bill, and precisely the same steps are necessary to its

passage as if it were called a bill.  Hinds' Parliamentary Practice, § 459. Under various sections of the statutes, ordinances may be enacted for specified purposes not pertinent to this case, and by section 2783 (Russell's St. § 571) it is provided that "the general council shall have power to pass, for the government of the city, any ordinance not in conflict with the Constitution of the United States, the Constitution of Kentucky and the statutes thereof." We strongly incline to the opinion that the intention was that all matters of legislation should be by ordinance or something equivalent thereto, and that any action by the council which, in its character, is legislative should be passed by both boards, but on separate days, whether such legislation was or was not called, on its face, an ordinance.  There is not such in the name, and, if the action of the council be legislative in its essential characteristics, the statute demands that the two boards shall act upon it on different days.  We cannot doubt that this joint resolution was legislative in character (the general council being the legislative body of the city government), nor that all the reasons for the requirement referred to apply to every species of legislation by whatever name it may happen to be called.  If any legislation is for the "government of the city," it is manifest from section 2783 that it must be enacted in the shape of an ordinance.  As almost, if not quite, all legislation which the general council could possibly enact must in some way be for "the government of the city," we think it a reasonable interpretation of the section to hold that the inclusion of the word "ordinance" in this section excludes all other forms of legislative measure, and, as we have indicated, if, in substance, the legislation is an ordinance, any misnomer of it is probably immaterial.  We say this although we find the authorities nearly uniform to the effect that an "ordinance" is a law or rule enacted by a local legislative body for the regulation of conduct in the future.  6 Words and Phrases, 5024 et seq.  We have concluded that the matters embraced in the joint resolution were sufficiently to operate in the future to meet this definition.

We have also concluded that, if the joint resolution was in legal effect an ordinance, it was void because not passed by the two boards on two different days. as required by section 2777.  If, on the other hand, it was not in legal effect an ordinance, then it is invalid under section 2780 of the Kentucky Statutes, by which it is provided that "all officers or agents of the city in any of its departments not herein required to be otherwise elected or appointed, shall be elected or appointed in such manner as may be prescribed by ordinance."  We do not doubt, as contended by complainant, that Messrs. Bullitt and McDonald, whether acting individually or as a commission, were intended by the general council to be regarded as agents of the city—that is, persons to act for it and by its procuration in respect to the subject-matter of the joint resolution—and, if agents of the city, section 2780 obviously required that they should be appointed in such manner as might be prescribed by ordinance.  If the joint resolution is not to be treated as an ordinance, there is no authority for their appointment; but, if the joint resolution is to be treated as an ordinance, its invalidity is apparent because it was not passed on different days by the two boards of the general council, as required by section 2777.

In short, Messrs. Bullitt and McDonald are to be regarded either as agents or as officers of the city.  There is no other attitude possible for them in the premises.  Whether one or the other, we find no lawful authority for their appointment, inasmuch as no ordinance is shown which meets the requirements of section 2780 of the Kentucky Statutes.  The joint resolution was either what it calls itself, or, in legal effect, it was an ordinance, though not called so.  If not an ordinance, it did not meet the requirements of section 2780, and consequently conferred no lawful authority on the mayor to appoint or employ either an officer or an agent.  If it was in legal effect an ordinance, then it is void because it was passed on the same day by both boards of the general council—a fact conceded at the hearing.  We think these views find much support in the opinion of the Court of Appeals in Lowery v. City of Lexington, 116 Ky. 157, 75 S. W. 202.

6. Section 157 of the state Constitution in effect forbids any municipality to become indebted in any manner or for any purpose for an amount exceeding in any one year the income and revenue provided for such year without

a popular vote to authorize it, and it provides, also, that no contract made in violation of the provisions of the section shall be enforceable. Here, it is agreed that for the fiscal year which ended August 31, 1907, the constitutional limit had been reached. We find, also, that while the joint resolution was approved August 27, 1907, it expressly provided that any indebtedness incurred under its provisions should be paid out of taxation to be levied in the fiscal year which was to begin on September 1, 1907, and it is agreed that for the latter year the limit had not been reached. While the joint resolution was enacted and approved in August, 1907, the contract or agreement sued on was not entered into until September 3d following, and it is contended that the joint resolution is void because it was thereby attempted in one fiscal year, wherein the constitutional limit had been reached, to bind the revenues of the next succeeding fiscal year, thus, in effect, authorizing in the fiscal year in which the constitutional limit had been reached an additional indebtedness to be taken care of out of the revenues of the next succeeding fiscal year. Would such action by the general council evade section 157 of the Constitution is an important question. The general council might have waited five days (namely, from August 27th to September 1st), and then have passed the joint resolution, and have thus freed this point from doubt. Instead, the general council passed the joint resolution on August 27th, and provided in it that it should, as to one of its most essential features, take effect in the next succeeding fiscal year wherein sufficient revenue was to be raised to pay any indebtedness created under the joint resolution. We are not sure that the Court of Appeals has ever decided the precise question thus raised, although its opinions in certain cases may possibly be so interpreted. We should, of course, have been bound by any interpretation of this section of the Constitution which the Court of Appeals of the state might have made. The cases referred to are those of Beard v. City of Hopkinsville, 95 Ky. 239, 24 S. W. 872, 23 L. R. A. 402, 44 Am. St. Rep. 222, and Ramsey v. City of Shelbyville, 119 Ky. 180, 83 S. W. 116, 1136, 68 L. R. A. 300. We do not deem it necessary to say more on this phase of the case: the views we have expressed upon other phases of it rendering it unnecessary.

7. The complainant urges that, as the city in this matter was acting in a proprietary and not in a governmental capacity, it is bound by certain principles of equity which control where the parties to the action are individuals. The doctrine which the complainant thus invokes is nowhere stated more clearly than in the very recent case of Schwalk's Adm'r v. City of Louisville, 135 Ky. 570, 122 S. W. 860, 25 L. R. A. (N. S.) 88, decided by the Court of Appeals in December last. It was there said:

"It is, however, insisted for appellant that a municipality is charged with the performance of duties of a private and corporate character, as well as those of a political or governmental nature, and that, as to the former, the municipality stands upon the same footing with a private corporation for injuries resulting from its negligence. This is undoubtedly true."

Here, it is certain that the complainant, in good faith, entered into an agreement with persons which it (probably without counsel) supposed were authorized to act for the city. It is equally true that it entered in good faith upon the performance of the labors which, by that contract, it engaged to perform, and that, in performing the stipulations of the agreement, it not only did a great amount of work, but expended over $10,000 in the way of traveling expenses and board bills incurred by it. Again, it is true that the city was fully informed of all the facts while the work was in progress and the expenses being incurred. Ordinarily, such a state of fact might supply strong reasons for an estoppel in a suit between individuals; but legislation for municipalities proceeds upon the idea that, while the self-interest of individuals will sufficiently stimulate carefulness on their part in their own affairs, cities must be safeguarded by strict laws and rules which must be enforced in the interest of the public, inasmuch as agents for the city have not that direct personal interest in the affairs of its principal as individuals have in their own affairs. Here, if the corporation known as the Commissioners of the Sinking Fund or that known as the Louisville Water Company had employed the complainant under similar circumstances, it might be that the equitable principles referred to might apply; but the city stands upon a

different footing. In all it does it is bound by statutory and constitutional provisions which cannot be disregarded, though those provisions are not applicable to the corporations mentioned' which control the city's property interests, and which, if themselves sued, might have been subject to the equitable principles we have noticed. In fact, we find that, while the city was chargeable with knowledge of all that was going on, the general council was endeavoring by the joint resolution to get information for its guidance in the legislative function of determining whether it should consent by an ordinance to the provisions of the act of March 6, 1906, whereby there might be a transfer from the Water Company to the board of waterworks of certain property. But, apart from these matters, the city undertook to make the contract with the complainant; the city owes the indebtedness, if any one does; the city is sued upon it; and the city must pay it, if so adjudged. This being true, we' are' aware of no equitable principle which would authorize the court to disregard the plain constitutional and statutory provisions for the government of cities which we have referred to, and one hereafter to be noticed. The court has felt to the full the hardship of the case upon the complainant. Any mere sympathy we might have has been with the complainant. But these things are unavailing, and the language of the Court of Appeals in Craycraft v. Selvage, 10 Bush (Ky.) 708, is as applicable here as it was there, when it was said that "persons dealing with a municipal corporation are bound at their peril to know that the contracts made by the officials of such corporations are made in the mode pointed out by the charter and ordinances; and if they fail they must suffer the consequences." We are quite well satisfied that the principle which found expression in Schwalk's Adm'r v. Louisville is not applicable to this case.

8. We find in the Kentucky Statutes no definite provision as to how cities of the first class shall execute written contracts, nor how contracts generally, and particularly such as relate to labor or other things done for the city, shall be entered into, though we take it, upon general principles, that it is competent, from the necessities of the case, for the city to act by an agent duly empowered by it. As a municipal corporation, like any other corporate body, must act through agents, we assume that if the general council could, with the approval of the mayor, validly authorize the making of the contract with the complainant, it could appoint agents to do what was desired.

But section 162 of the state Constitution provides that "no county, city, town or other municipality shall ever be authorized or permitted to pay any claim created against it under any agreement or contract made without express authority of law, and all such unauthorized agreements or contracts shall be null and void."

The complainant insists that there is law authorizing the indebtedness sued on, and we think the burden is necessarily upon it to show what the Constitution calls "express authority of law" for the creation of the liability. We have not been shown such authority in any statute of the state, nor in any lawfully enacted ordinance of the city, and hence we cannot see any way to avoid the mandate of the constitutional provision.

This opinion, already long, need not be extended to notice many other somewhat incidental questions which have been discussed by counsel. What we have' said, if sound, is sufficient to dispose of the litigation. Similar considerations relieve us of the task of ascertaining whether the hotel bills and traveling expenses, and possibly some other items in complainant's computation of what is due, were "necessary" within the meaning of the agreement.

The bill must be dismissed, with costs.