## CORBETT v. WINSTON ELKHORN COAL CO.

### (Circuit Court of Appeals, Sixth Circuit. March 14, 1924.)

### No. 3886.

1. **Contracts ⬳143, 152—Courts do not make contracts; words given ordinary meaning.**

    Courts do not make contracts for parties, and where the language used in a contract is plain and unequivocal, it must be given its plain, usual, and ordinary meaning, unless it further appears that words or phrases therein have acquired a trade or technical meaning.

2. **Contracts ⬳147(1)—Must be construed in accordance with intention of parties.**

    Contracts must be construed in accordance with the meaning and intention of the parties, in so far as that intention can be ascertained from the language of the whole contract, the situation of the parties at the time the contract was written, the purposes and subject-matter of the contract, and the mutual construction by the parties themselves of the terms and conditions therein written.

3. **Evidence ⬳397(1), 461(1)—Parol evidence not received to vary written contract, but only to aid in construing language according to understanding of parties.**

    Parol evidence may not be received to vary the terms of a written agreement, but only for the purpose of aiding a court in construing the language used in accordance with the understanding of the parties at the time the contract was written.

4. **Reformation of instruments ⬳14—Contracts reformed to express real agreement.**

    Where the language of a contract is not subject to a construction in accordance with the understanding and agreement of the parties at the time it was written, a court of equity will reform the contract to conform to the real intent, agreement, and understanding of the parties.

5. **Sales ⬳76—Price on date of order held to control amount to be paid by agent.**

    Under a sales agency contract, whereby agent was to pay the market price, or best available price, less 10 per cent., *held*, that the agent was not to pay to the principal the market price on the day of shipment, less 10 per cent., but only the purchase price, less 10 per cent., which purchase price was required to be the market price, or best available price, on the date of the order.

6. **Sales ⬳23(3)—If principal had right to reject orders, he must act promptly.**

    If coal company, under sales agency contract, had the right to reject orders sent by agent, it was required to do so when the orders were received, and was liable for breach of contract, where it failed to fill the orders, though not rejecting them, until long after their receipt.

7. **Sales ⬳150(1)—Contract held broken by principal, and not by sales agent.**

    Under sales agency agreement, whereby principal's output of coal was to be sold to agent for market price or best available price, less commission, if, as claimed, the principal was entitled to the market price, or the best available, in either the export or domestic market, on the day of shipment, the agent *held* not in default until the principal billed the coal at such prices and he refused to pay them, and the principal's refusal to fill orders unless he would guarantee a definite price for a definite time was a breach of contract.

8. **Equity ⬳42(1)—Objection of no right in equity must be taken at first opportunity, or it is waived.**

    The objection in a suit for specific performance that there is no right to proceed in equity must be taken at the first opportunity; other-

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

wise it is waived, and waiver will be effective, unless the case is wholly without color of equity jurisdiction.

9. **Equity** ⬦⟹53(1)—**Claim held not so obviously without foundation in equity jurisdiction that defense of adequate remedy at law could not be waived.**

In action by coal company against sales agent, wherein defendant counterclaimed for specific performance and an accounting, *held*, that defendant's claim was not so obviously without foundation in equity jurisdiction that the defense of adequate remedy at law could not be waived.

10. **Appeal and error** ⬦⟹171(2)—**Cause treated as case in equity below so treated on appeal.**

Where the parties proceeded in the court below as in a case in equity, and came up by appeal without either side doubting the equity jurisdiction, the Circuit Court of Appeals may make a final disposition of the controversy just as if the equity jurisdiction was indisputable; the claim not being so obviously outside the jurisdiction of equity. that defense of adequate remedy at law could not be waived.

Appeal from the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Action by the Winston Elkhorn Coal Company against E. J. Corbett, brought in a state court and removed to the federal court. Decree for plaintiff, and defendant appeals. Reversed and remanded, with directions.

On November 28, 1919, E. J. Corbett, of Detroit, Mich., entered into a contract with the Winston Elkhorn Coal Company, of Regina, Ky., by the written provisions of which Corbett agreed to buy and the coal company agreed to sell to Corbett, all of the output of screened coal and run of mine coal, if desired, from the Kewanee and Winright mines, owned and operated by the coal company, at market price at time of shipment, or best available price, less 10 per cent. of selling price to E. J. Corbett for his commission, and that the contract should expire April 1, 1924. On July 2, 1919, a similar contract had been entered into between the same parties for the output of both mines, which differed from this contract, in that it expired April 1, 1920, and Corbett, in addition to the 10 per cent. commission, was to receive half of all amounts obtained over $2.50 per ton mine run basis. Some differences had arisen between the parties in reference to the first contract, and the contract of November 28th purported upon its face to be "an adjustment of our contract of July 2, 1919." After the execution of the latter contract, orders taken under the former contract were filled by the coal company, and except as to these orders and some shipments made by the coal company to the Ohio & Michigan Coal Company, orders were given by Corbett and shipments made by the coal company under the terms and provisions of the contract of November 28, 1919, until the 24th day of March, 1920, during all of which time the United States Fuel Administration was in control and had fixed a flat price of $3 per net ton f. o. b. mines, which price regulation was in effect until April 1, 1920. On and after March 24, 1920, the coal company refused to make further shipments of coal upon Corbett's orders, and up to the time its mines shut down in December, 1920, it mined and shipped 27,421 tons of coal to other purchasers, for which coal it received in the aggregate $231,692.

On June 21, 1920, the coal company brought an action in the Pike circuit court of Kentucky against E. J. Corbett to recover the sum of $8,089.39 for coal shipped to Corbett in March, prior to its refusal to make further shipments and for 15 cents per ton, amounting in the aggregate to $1,115.65, which balance it claimed was yet due and owing to it on a number of tons delivered to defendants during the months of December, 1919, and January and February, 1920, and sought by garnishee process to reach money due to Corbett from the G. E. George Coal Company in satisfaction of its claim. On the applica-

⬦⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tion of Corbett the cause was removed to the United States District Court for the Eastern District of Kentucky. On June 2, 1921, Corbett filed an amended answer and counterclaim denying that he was indebted to the plaintiff for 15 cents per ton on coal received by him in December, 1919, and January and February, 1920, amounting to $1,115.65, or any other sum, and averring, among other things, the execution of the two contracts to which reference has hereinbefore been made; that plaintiff was indebted to him in the sum of $356.54 commission on coal sold and delivered by it to other parties while these contracts were in force, and without his knowledge and consent; that defendant had been guilty of a breach of contract; and praying for specific performance and for an accounting in damages. To this answer and cross-petition the coal company filed a reply, which in substance denied the allegations of the answer and cross-petition.

Upon the trial of the issue so joined the District Court dismissed defendant's cross-petition and entered a judgment for the plaintiff for coal shipped upon defendant's order in March 1920, for $7,991.84, less a credit thereon of $166.04 for commissions on coal shipped by plaintiff on orders from Ohio & Michigan Coal Company during month of December, 1919, leaving a net balance due the coal company of $7,825.80, with interest thereon from the 20th day of April, 1920, from which judgment the defendant appealed.

J. J. Moore, of Pikeville, Ky., and Robert J. Hanley, of Detroit, Mich., for appellant.

T. H. Harman, of Pikeville, Ky. (Harman, Francis & Hobson, of Pikeville, Ky., on the brief), for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DONAHUE, Circuit Judge (after stating the facts as above). [1-4] It is claimed upon the part of the coal company that the contract of November 28, 1919, was not a contract for the sale and purchase of coal, but merely a sales agency contract. The first paragraph of this contract read as follows:

"E. J. Corbett, Detroit, Mich., agrees to buy from the Winston Elkhorn Coal Company, of Regina, Ky., and Winston Elkhorn Coal Company agrees to sell to E. J. Corbett the output of Kewanee and Winright mines."

Courts do not make contracts for parties, and it is a rule of construction that, where the language used in a contract is plain and unequivocal, it must be given its plain, usual, and ordinary meaning, unless it further appears that words or phrases therein have acquired a trade or technical meaning. It is also a rule of construction that contracts must be construed in accordance with the meaning and intention of the parties, in so far as that intention can be ascertained from the language of the whole contract, the situation of the parties at the time the contract was written, the purposes and subject-matter of the contract, and the mutual construction by the parties themselves of the terms and conditions therein written. Parol evidence may not be received to vary the terms of a written agreement, but only for the purpose of aiding a court in construing the language used in accordance with the understanding of the parties at the time the contract was written, but where, under the state of the proof, the language is not subject to such construction, a court of equity will reform the contract to conform to the real intent, agreement, and understanding of the parties.

After this contract was executed, the coal company, with the knowledge of Corbett, and without objection on his part, referred to him in a number of letters as its selling agent, and Corbett, in many letters that he wrote to the coal company and to others interested in the purchase of coal, referred to himself as the selling agent of the Winston Elkhorn Coal Company. For these reasons, we are inclined to think that both parties understood and intended that this was a sales agency contract, and not an absolute contract of purchase and sale; but, in view of the conclusion this court has reached, we do not consider this question of vital importance in the determination of the issues in this case. Accepting the theory of the coal company that this was merely a sales agency contract, nevertheless, under its terms and provisions, it was required to ship upon the orders secured by its agent, Corbett, the entire output of these two mines, and Corbett was required to pay therefor the market price, or best price available, less 10 per cent. commission.

[5] It is also claimed by the coal company that Corbett was to pay to it the market price, or the best price available, on the day of shipment, and not on the day the orders were received. The language of this provision of the contract as to price is not more definite, certain, and unambiguous than the first paragraph, which provides that "Corbett agrees to buy, and the coal company agrees to sell to Corbett," the entire output of these two mines, and therefore is equally subject to construction or reformation by a court of equity, in accordance with the mutual intention and understanding of the parties at the time the contract was written.

A contract requiring a selling agent to pay the market price on day of shipment would be practically impossible of performance by the agent on a rising market, and especially so if the principal is permitted to delay shipment through necessity or whim until the market price on day of shipment is largely in excess of the price at which the agent had sold the coal. On the other hand, in case of a falling market, such a provision would be wholly inconsistent with the further provision in this contract that the principal is to receive the whole of the selling price, less 10 per cent. commission; that is to say, if coal were sold to-day for $3, and at date of shipment the market price were but $2, the principal under one provision of this contract would be entitled to all the money received by the agent, less 10 per cent., and under the other provision to but $2, less 10 per cent. although the agent, received $3 for his principal's coal. It must be remembered that this contract was to continue for practically five years, and it necessarily must have been within the contemplation of the parties that in that length of time there would be both a rising and falling market. Nor is it conceivable that a selling agent would be sent out by his principal to sell coal at the market price, or best price obtainable, upon day of shipment. If the agent were able to find any customers willing to buy upon these conditions, such customers would certainly demand, not only a further agreement as to prompt delivery, but also a definite date when such delivery would be made, and there is nothing in this contract that would authorize the agent to bind his undisclosed

principal to a definite date of delivery. In fact, the obligation to make any shipments at all is subject to strikes, accidents, wrecks, or car supply, or other occurrences beyond control of either party.

That the coal company did not so understand this contract at the time it was written, or even as late as the 24th of March, in the subsequent year, is evidenced by its second telegram of that date, in which is stated, "We have no orders from you or your customers accepted by us." There was nothing except the price named in such orders that called for acceptance on the part of the coal company. It was not its business to whom the coal was sold, or where shipments were to be made. The only thing that could possibly have justified it in the rejection of orders would be that the selling price, if any was named therein, was not the market price, or the best available price. If no selling price was named in the orders, then the coal company would be required to fill the same, and depend upon the contract for the determination of the selling price for which its agent must account. To the same effect is the last paragraph of its letter of March 27th (Defendant's Exhibit No. 22), in which it demanded that Corbett should forward all orders directly to it for the April shipments, and that these orders—

"must show the price of coal f. o. b. mine. * * * These orders must be for the best available price in the market, and on receipt of them we will determine whether these orders are for such prices. * * * "

If the coal company then understood that it was to receive the market price, or best price available, on date of shipment, or that Corbett, as its agent, was to sell the coal to his customers at the market price, or best available price, on day of shipment, then it would have been wholly impossible for Corbett to show in his orders the price at which such coal had been sold. The market price on day of shipment could not, at the time the orders were taken, be definitely determined.

That it was the understanding of both parties to this contract that the coal company was to receive the price for which Corbett sold the coal on the day the order was given, less 10 per cent. commission, no more and no less, regardless of a rising or falling market, is further evidenced by the fact that after this contract was written, and during federal control, shipments were made upon orders taken by Corbett under the July contract, which contains substantially the same provision as to price. Some of this coal was sold for less, and some was sold for more, than the government price. On January 17th Corbett wrote to the coal company:

"The old orders from October are practically cleaned up, of which we are glad, because, while there was some coal over the government price, yet there was some mine run coal sold on the thick vein government price, and we are glad we have gotten rid of most of those orders for the mine run that was sold at $2.55."

In reference to this W. M. Coleman testified:

"I believe he paid us for a few cars for December, January, February, and March at $3.25, and some several cars at less than government price. I don't remember just how much for each one. In our letters to him we did not find any fault on account of this."

Shortly before this, this witness had testified that Corbett had remitted less than the government price for several cars, to which the company did not consent. Corbett in his letter of January 27, 1920 (Defendant's Exhibit J), called the coal company's attention to the fact that in this connection it had overlooked the price for December shipments on these prior orders that were in excess of government prices for sale made after October 30th. This seems to have ended that controversy, if in fact it amounted to a controversy.

The coal company's letter of April 12th further evidences its understanding of this provision of the contract. Corbett, in pursuance of the demand made upon him in the company's letter of March 27th, notified the coal company as to his understanding of the April prices. The coal company denied that these prices were the market prices, or the best available price, and for that reason refused to ship coal, although the prices upon the date of shipment might have been less, but more probably would have been greater, than the price named at the time the order was given.

However that may be, this question is equally unimportant in so far as it applies to coal shipped under this contract. At the time the contract was executed, the government had resumed control of the fuel markets. There was no open market. The price fixed by the government obtained from the date of this contract until the 1st of April, 1920, so that, during all the time coal was shipped under this contract, the price of domestic coal was the same on the day of shipment as it was at the time the orders were given.

It does appear, however, that in the latter part of March there was a market for export coal at $3.60 to $3.75 a ton, subject to a differential in south-bound freight rates to Charleston, S. C., between the rate from the coal company's mine and the rate from Elkhorn City. On March 15th the Bewley-Darst Coal Company wrote the Winston Elkhorn Coal Company a letter making a proposition to purchase some of its coal to move south-bound at the prices named, "if you think you can get a satisfactory car supply from the Chesapeake & Ohio Railway." This letter was mailed to Corbett on March 17th, and on March 19th he wrote the Bewley-Darst Coal Company that:

"Because of the wholesale confiscation of coal the past three months, and with the present coal car supply, it would be very inconsistent to try and make shipments under the present condition to the southern export market. We, however, anticipate an improvement in car supply. * * * Under the circumstances it is necessary to hold the matter in abeyance and await further developments, and if our car supply improves, so that we could make shipments, we will be glad to do so."

On the same date Corbett wrote the coal company, inquiring as to labor conditions and the outlook for an increased car supply, and proposing to make a personal effort through the Chesapeake & Ohio Railway to get more cars for these mines, so as to take advantage of the market as soon as government control should be eliminated, and also inclosing a copy of his letter to Bewley-Darst Coal Company. It does not appear that the coal company replied to this letter. On March 24th it wired Corbett as follows:

"We can sell entire output of both mines for several months for $3.75 per short ton f. o. b. mines net to us. Will you guarantee sale for same from date until April 1st and best available price in market after April 1st. Wire us now."

To which telegram Corbett replied:

"Your wire date. We propose to live up to the terms of our contract. Refer any inquiries for coal to us."

In reply to this the coal company sent Corbett the following telegram:

"Your wire. You refused last week to consider proposition of good buyer at advanced price and with present market conditions we cannot lose time required for reference to customer to you. We must insist that you waive commission, if you are entitled to any, or else meet the price offered by other parties. We have no orders from you or your customers accepted by us and must insist on knowing the price of each car before shipment. Our wire Wednesday gave Wednesday export price and we insist on best available market. Will you give us order for $3.75 net to us, mine run on Thursday loading. Please wire."

To this Corbett replied in part as follows:

"Your reported offer yesterday and last week were for export and no rates apply from your mines to Tidewater. You have orders for entire output both mines from us to be shipped. * * *"

Thereupon the coal company sold its output for the balance of the month of March for export trade for $3.75 per ton f. o. b. mines, and no further shipments were ever made upon the orders from Corbett then on hand, amounting to about 50 cars, or upon any later orders given by him. On March 27th the coal company wrote Corbett a letter, in which it complained that Corbett had violated the contract in a number of ways, and concluded this letter with the following statement:

"Without binding ourselves to accept any, we are asking you to forward to us orders for April shipments, which orders must show the price of coal f. o. b. mines and definite shipping instructions, including the name of consignee, ultimate destination, route, etc.; also the character of coal required."

On April 6th, Corbett wired the coal company:

"No notice of shipment. How many cars shipped since April 1st?"

And on the same day he wrote a letter, informing the coal company that the April prices for slack were $4, for mine run $4.25, for lump $4.50. On the 12th of April the coal company replied to this letter, saying that these were not the best available prices. There are a number of other letters and telegrams in the record to which it is unnecessary to refer. The ones above quoted fully state the situation that obtained when the coal company refused to ship further coal on Corbett's order on and after March 24, 1920.

It is insisted upon behalf of Corbett that when this contract was made the coal company knew that he was selling coal in Ohio, Indiana, Michigan, and Canada, with a selling organization having representatives in these different localities, and in no other place, that he was not engaged in the export business, and that it was the market

price of domestic coal in this territory that was in contemplation of the parties at the time this contract was made. However that may be, it does clearly appear from the evidence that Corbett was able to furnish to this coal company orders far in excess of its ability to fill the same promptly from the coal produced at both of its mines. Some of the orders given under the July contract were not filled until December of that year and in the early months of the following year.

W. M. Coleman testified that Corbett was always urging the coal company to speed up, so he could handle their business, that the company never found any fault with anything he did toward filling the orders, and that he tried to help the coal company in getting cars. So far as appears from this record, the nearest the coal company came to filling the orders given by Corbett was on January 14th, at which time there were orders for 22 cars that were yet unfilled. It further appears from the uncontradicted evidence of Mr. Greffley that on the 24th of March, when the company diverted its coal to the export market, there were orders for about 50 cars to different customers that were still unfilled. As appears by the statement (Defendant's Exhibit C), the company had shipped in March, on Corbett's order, but 57 cars all told. It is perfectly evident that it could not fill the balance of Corbett's orders in March, if it had shipped to him all of the coal it produced. That being true, neither the coal company, as principal, nor Corbett, as selling agent, had any coal in the latter part of March to sell to the export trade, or in any other market.

[6] It is insisted, however, upon the part of the coal company, that it had not accepted any of these unfilled orders given to it by Corbett in March. That statement was made in the company's second telegram of March 24th, and is repeated in the testimony of W. M. Coleman, who further stated that:

"On January 14th he wrote us to ship the coal to E. J. Corbett, care J. D. Albring. After that time he did not furnish us with any orders."

In making this statement, Mr. Coleman evidently overlooked the coal company's letter to Corbett of January 14th, a part of which is as follows:

"It would be some better for us if you will place the balance of our orders with Mr. Albring, and let us bill you to Russell, Ky., as we have to go to the C. & O. depot to bill our coal, and you know it is a little unhandy for us."

The fact that Corbett consented to do this in no way relieved the company from knowing what orders had been forwarded to Mr. Albring. If the coal company intended to reject any of these orders, for any sufficient reason, it was its duty to do so when the orders were received by Mr. Albring, to whom it had requested these orders to be sent. This it did not do, but it waited until it discovered that in the last week of March it could secure a somewhat better price by selling to the export trade, and could secure some other person to sell its coal on an 8 per cent. commission, instead of the 10 per cent. commission, agreed to be paid to Corbett. If, as claimed by the coal company, Corbett was its selling agent, then it was his undisclosed principal, and these contracts, made by its agent, Corbett, were its contracts,

and it was its duty to fill the same, regardless of the fact that after they were received an opportunity arose to sell its output for six days in March at a larger price.

[7] Even upon the claim of the coal company that the export market, as well as the domestic market, was in the contemplation of the parties at the time the contract was made, and that it was entitled to the best available market price at the time shipments were made, nevertheless this did not release it from shipping its entire output to Corbett, and billing it to him at the best price available on the date of shipment, which Corbett, under the coal company's present construction of the contract, would be required to pay. He would not be in default until he refused to do so. No claim is made that Corbett was not just as solvent then as he was when the coal company agreed to ship all its coal on his orders and look to him for payment. Upon any construction of this contract the coal company, in refusing to make shipments upon Corbett's orders, unless Corbett would guarantee a definite price for a definite time, neither of which the contract required him to do, was clearly guilty of a breach of contract in diverting the coal produced by it in the latter part of March from Corbett's orders to the export trade.

But, wholly regardless of which party to this contract was right or wrong in reference to the export coal shipped by the coal company from March 25th to April 1st, it is conclusive from this evidence, and particularly from the letters and telegrams exchanged between the parties, that neither party elected to terminate this contract on account of the claimed breach, and that both parties considered the contract in full force and effect on and after April 1, 1920. In this connection Mr. Greffley testified that the best price available from April 1st to April 10th was $4.25 per ton for run of mine coal. Mr. Gray, a witness called on behalf of the coal company, testified that "the market price in April was $4.15, and beginning on the 15th it was $5." Mr. Snipes, another witness called on behalf of the coal company, testified that in April the price was from $4.50 to $5 per ton, but he does not specify the time in April when these rates obtained, nor does he or Mr. Gray mention the grade of coal that was bringing these prices. Mr. W. M. Coleman, secretary and treasurer of the coal company, testified that the coal company sold coal after March 29th on an 8 per cent. commission, and that upon April 6th the price quoted by Corbett was not the market price; but he does not state the market price on that date, nor was the market price stated in the coal company's letter of April 12th to Corbett, in which letter the claim was made that the prices quoted by Corbett was not the market price. D. R. Coleman, president of the coal company, does not testify in reference to the best available price on April 6th, but he does testify that it was the policy of the company to ship all its coal to Corbett if he paid the best available price.

The failure and refusal of the coal company to ship coal on Corbett's orders received after April 1, 1920, was wholly unjustified, and a breach of its contract, regardless of whether that was the initial breach, or a continuation of the claimed breach in March of that year.

This conclusion necessarily follows from the fact that on the 6th of April, Corbett was offering $4.25 a ton, and insisting that was the best available price. The coal company, by the terms of its contract, was required to fill these orders, unless it had a good and sufficient reason for refusing to do so. The price offered by Corbett was largely in excess of the highest prices available under government control but a few days before. The burden was upon the coal company to justify its refusal to accept these offers by establishing, by a preponderance of the evidence, that the price offered by Corbett was not the market price, or the best price available on that date. This it wholly failed to do, but, on the contrary, the preponderance of the evidence upon this proposition is with Corbett.

[8] It does not necessarily follow that Corbett is entitled to specific performance. The contract which Corbett sues upon is not of that class where specific performance is usually awarded. If the objection had been duly made that Corbett had an adequate remedy at law, it might have been necessary to dismiss the bill. The objection that there is no right to proceed in equity must be taken at the first opportunity, otherwise it is waived. Audit Co. v. Louisville, 185 Fed. 349, 351, 107 C. C. A. 467; Toledo Computing Scale Co. v. Computing Scale Co., 142 Fed. 919, 922, 74 C. C. A. 89.

[9, 10] This will be an effective waiver, unless the case is wholly without color of equity jurisdiction. Warmath v. O'Daniel, 159 Fed. 87, 91, 86 C. C. A. 277, 16 L. R. A. (N. S.) 414. We have here, not only a prayer for specific performance and a prayer for accounting, but a claim that the damages are of such character that they can only be properly ascertained by an accounting in equity before a master to avoid a multiplicity of suits. We are not prepared to say that such a claim is so obviously without foundation in equity jurisdiction that the defense of adequate remedy at law cannot be waived. On the contrary, we think it can be. We find here that, even if the original suit was not in equity, the counterclaim clearly purported to be, that the parties proceeded in the court below as in a case in equity, that they have come to this court by appeal, and that neither side has doubted the equity jurisdiction. Under these circumstances we may rightly make a final disposition of the controversy, just as if the equity jurisdiction were indisputable.

From this record it appears that there is no conflict of evidence in reference to the damages sustained by Corbett by reason of the breach of this contract by the coal company. It clearly appears by the uncontradicted evidence of W. M. Coleman that this company produced and sold from its mine from April 1, 1920, until the mine shut down in December, 1920, 27,421 tons, for which it received a total price of $231,692, upon which Corbett was entitled to 10 per cent. commission, amounting to $23,169.20. We are unable to find in this record any accurate statement of the amount of coal shipped to the export trade between March 24th and April 1st, and for that reason we cannot determine the commission that would be due to Corbett upon that coal. Nor does it appear from the evidence when, if at all, these coal mines were operated after the shut-down in December of 1920. Corbett

made no offer to prove these things. Therefore the case will not be continued, as requested by Corbett, for an accounting and assessment of further damages.

For the reason stated, that part of the decree of the District Court dismissing the defendant's answer and cross-petition is reversed, and the cause is remanded to the District Court, with directions to enter a decree for damages in favor of E. J. Corbett and against the Winston Elkhorn Coal Company for $23,169.20, less the sum of $7,825.80, found to be due to the Winston Elkhorn Coal Company from E. J. Corbett for coal shipped in March, 1920, leaving a balance of $15,343.-40, with interest thereon at 6 per cent. from the 20th day of April, 1920.