### HOTCHNER v. NEON PRODUCTS, Inc.
### No. 10371.

Circuit Court of Appeals, Sixth Circuit.
Sept. 8, 1947.

W. C. Bachelder, of Indianapolis, Ind., and F. J. Gallagher, of Toledo, Ohio (Fraser, Shumaker, Kendrick & Winn, of Toledo, Ohio, and Bachelder, Bachelder & Fife and Albert Stump, all of Indianapolis, Ind., on the brief) for appellant.

Donald F. Melhorn, of Toledo, Ohio (Marshall, Melhorn, Wall & Bloch, of Toledo, Ohio, and Lippincott & Lippincott, of Lima, Ohio, on the brief), for appellee.

Before HICKS, ALLEN, and MILLER, Circuit Judges.

HICKS, Circuit Judge.

Fred Hotchner, inventor and co-owner of certain patents for an animated border for advertising clocks, brought suit against Neon Products, Inc., a sign manufacturer and licensee under those patents, for an accounting for royalties and judgment under the license contract embodied in Exhibits "A," "B" and "C" of the complaint, and for damages claimed to occur from defendant's breach of the contract in failing to supply monthly statements of sales, royalties, etc., in detail, as provided therein.

Neon denied that it owed Hotchner any money under the contract up to May 1942, the date the last royalties were accepted by Hotchner; and further denied that it breached the contract. It averred that by an oral agreement made with Hotchner on March 10, 1940, the detailed monthly statements were to be withheld and the information contained retained in its files subject to inspection by Hotchner. Neon filed a counterclaim.

The issues were referred to a Master who found for Hotchner in the sum of $2051.35 for royalties on sales made since the last payment accepted by him. Neon concedes its liability for that amount. The Master found against Hotchner on all other claims made by him. Neon's counterclaim was dismissed by the Master. The court confirmed the Master's report and entered judgment for the amount of his recommendation and dismissed Neon's counterclaim. Hotchner appealed. Neon did not appeal.

The appeal raises two principal questions — (1) whether Neon breached the contract; and (2) whether it was liable for additional royalties on 7157 signs under the terms of the contract.

The answer to the first question turns upon whether Hotchner by an oral agreement relinquished his rights under the terms of the contract to monthly detailed statements. Hotchner insists that if he had received those statements he would not have been put to the expense of an audit of Neon's books, the cost of which, plus certain other items, he claims as damages.

The answer to the second question depends upon the meaning of two clauses in the contract relating to sales, namely, "individually at retail" and "in quantity." If the sales were made "individually at retail," Hotchner was entitled to larger royalties on sales of 7157 signs than those allowed him by Neon upon its determination that the sales were made "in quantity."

Sam Kamin, President of Neon, met Hotchner in March 1939, when he brought his motionizer idea for an animated clock border to Neon's plant. Kamin testified that it had "possibilities" and that a sample was made up and "it looked good." Hotchner was shown over the plant and saw a list of their accounts. Kamin said, "* * * it was my job to show him that we were the logical company for him to hook up with; that we had a selling organization and that we could do a real job for both of us." Kamin told Hotchner of their national accounts in the soft drink industry (large concerns operating nationally either through jobber or dealer organizations) and of their retail sale organization of direct specialty salesmen who would buy a sample sign and sell them from door to door. The parties came to an under-

standing and operated under a preliminary contract for manufacture and sale of Hotchner's motionizer by Neon from March 1, 1939 to June 26, 1939, when the first of the three instruments embodying the written contract sued upon was executed.

These instruments (Exhibits A, B and C to the complaint) were entered into respectively on June 26, 1939; April 30, 1940, and November 17, 1941. Pertinent portions of Exhibit A are as follows:

"I. Grant

"(1) Hotchner hereby grants to the Company the sole and exclusive non-assignable right * * * to make, sell and use Electric Clocks having animated border effects produced by revolving interceptor disks which variously screen or filter the light of elongated illuminants according to said patents. * * *

\* \* \* \* \* \*

"II. Royalty

"(1) The Company agrees to pay royalties to Hotchner on all Portable Devices which it manufactures and/or sells or causes to be sold hereunder in quantity orders as follows:

"(a) For all devices having interceptors eight inches or less in diameter the sum of twenty-five (25¢) cents for each interceptor device.

"(b) * * * more than eight inches and twelve inches or less * * * the sum of thirty-five (35¢) cents for each interceptor device.

"(c) * * * more than twelve inches and eighteen inches or less * * * the sum of fifty (50¢) cents for each interceptor device.

"(d) * * * more than eighteen inches and twenty-four inches or less * * * seventy-five (75¢) cents for each interceptor device.

"(2) The Company agrees to pay royalties to Hotchner on all devices which it manufactures and/or sells or causes to be sold for permanent outdoor installation, sold individually at retail, and all Portable Devices sold individually at retail through its own sales organization according to the

schedule above increased by fifty (50%) per cent.

\* \* \* \* \* \*

"V. Books of Account

"The Company agrees to keep full and accurate books of account of the business done hereunder and to give Hotchner or his duly accredited representative free access to said books at any time during the term of this agreement and for a period of six (6) months after its termination.

\* \* \* \* \* \*

"VI. Statements

"The Company agrees that on or before the tenth (10th) day of each and every calendar month during the term of this agreement it will mail to Hotchner a written statement showing all the devices sold during the preceding calendar month, identifying said devices by the customer's name and the general description or type designation of said devices. At the time of mailing each of said statements the Company shall pay to Hotchner the royalty due Hotchner on all devices for which payment has been received by the Company during said calendar month.

\* \* \* \* \* \*

"X. Term

"This agreement shall remain in full force and effect from the date hereof for a term of two years unless sooner cancelled in accordance with Clause XI, for an additional two years term by the consent of the parties hereto." (Italics ours.)

Exhibit A was executed by Hotchner and the Company and was "Approved by Montroy Electric Company Montroy Electrical Mfg. Co." Montroy seems to have had some interest in the patents, the nature of which is not clear.

Exhibit B modified Exhibit A but did not supplant it. Section II of Exhibit A was amended but clauses a, b, c, and d, of paragraph 1 thereof were left unchanged. New clauses e, f, g and h were added to fix the price upon various sizes of a new type of shifting or oscillating interceptor disks. Paragraph 2 of Article II of Exhibit A was amended to increase the royalty on devices sold "individually at retail" now reads as follows:

"The Company agrees to pay royalties to Hotchner on all devices which it manufactures and/or sells or causes to be sold for permanent outdoor installations *sold individually at retail,* and all Portable Devices *sold individually at retail* according to the above schedule increased by one hundred (100%) per cent, provided, however, that this provision shall not apply to Portable Devices *sold in quantity to National Advertising Firms and resold by such firms to others."* (Italics ours.)

Section IV on Statements amended Sec. VI of Exhibit A by adding two paragraphs, the second of which is material here:

"(3) At the time of the making of such statements the Company shall mail to Montroy Electric Company at Los Angeles, California, summaries of such statements showing all monies paid to Hotchner under this agreement."

Exhibit B extended the agreement to December 31, 1944.

Exhibit C incorporated into the previous agreement provisions relating to signs with "Pulsating Background" and did not distinguish between royalties for retail and quantity sales. Exhibit C was not approved by Montroy Electric Company.

Differences developed late in 1941. On March 12, 1942, Hotchner wrote Neon requesting that it "furnish by mailing to me . . . within three days a full and complete statement in writing showing all devices sold to date under said agreement, identifying said devices by the customer's name and the general description or type designation of said devices" pursuant to the provisions of Article VI of Exhibit A.

Kamin, President of Neon, answered this letter on March 16, 1942, reminding Hotchner that in April 1940 Neon had learned through Weiss, a salesman for electrodes to the sign industry, who dealt with both Neon and Montroy, that Montroy, co-owner of patents for the motionizer devices, had revealed to Weiss a great deal of information as to "amounts, types and customers who were buying and who were about to buy signs using the motionizer device, * * *" information which should have been confidential. We quote

the next paragraph of the letter in its entirety:

"In this month we called you to our office and in the presence of Mr. Howenstine, you and I, discussed this phase of the contract and we all agreed for the time being that this information should be withheld,—that it was confidential and that no one had any right to this information outside of our immediate employees and yourself. This modification of the license agreement was not put into writing and it existed from that time more or less a gentleman's agreement."

Hotchner testified that he was advised by Neon in April 1940 that there had been a leak of confidential information by parties in the Montroy Company and that though he "didn't know whether this thing had transpired or not; and * * * would not surrender any right to the detailed information" he would *"agree to these statements being made in detail and kept for me by the company until such time as I required."* (Italics ours.)

Hotchner also testified:

"In May 1940, defendant stated that Mr. Montroy who had some interest in these patents, had disclosed some of the names of customers to competing companies. *We agreed that only summary statements would be sent* to Montroy", [this modification appears in Article IV of Exhibit B] *"and that they would keep detailed statements for me in their safe until I called for them.* Later in 1941 I called for these statements but defendants refused to let me see them. This continued until my letter of 1942 demanding the statements when they refused." (Italics ours.)

Kamin's testimony as to the oral modification was:

"It was agreed, and Mr. Hotchner in substance said: 'I am satisfied that the detailed statements of the customer names should remain here in the office. You give me every month a summary of all the sales. But you give me permission to look at the detailed statements whenever I want to.' We said, 'O.K. That is the way it will be from now on. From the next statement on, you will receive a summary of every size, every sale made; but the detailed state-

ment showing the customer names will remain here in the office in Miriam's custody, the bookkeeper; and you are at liberty to look at it any time you want to.' "

These statements were kept and Hotchner himself introduced them in great detail in Exhibit 46. He testified that he asked Neon's bookkeeper if they were keeping them and she replied affirmatively.

Another paragraph in Neon's letter of March 16, 1942, indicates that there was no refusal to yield the information, although there was a refusal to let the statements out of Neon's hands. This paragraph reads:

"Now getting back to the record situation, we have in our office in addition to the information already passed on to you in regard to number and types of motionizers, the customer names. *We will be glad to furnish these to you, to your co-owners or to your auditors at any time you say for visual inspection and checking.* However, we are reluctant to let these pass into your hands or the hands of other persons where we feel highly suspicious that they will be used to a detrimental effect to our company." (Italics ours.)

The last sentence of this letter sprang from the fear of Neon that Hotchner was looking for a new sales connection. It is immaterial here except as it may throw light on Neon's reluctance to turn all records over to Hotchner without question, as was apparently done in the early months of the contract.

When Hotchner did demand the right to send an accountant, Neon asked, in view of the confidential nature of the information, that he be a certified public accountant.

Hotchner employed one Huffman, a certified public accountant, who made an exhaustive audit of the books at a cost to Hotchner of over $5,000. He claimed this amount as damages because of failure of Neon to fulfill the terms of the contract requiring Neon to furnish Hotchner detailed statements of sales and to permit his representatives to examine the books.

It seems clear enough from Hotchner's own testimony that the parties orally agreed that the statements might be withheld and the information kept in detail for him by the company until such time as he required.

■ There can be no controversy but that a written contract may be modified or amended, after it is made, by the express agreement of the parties to it either in writing or by parol, or by the acts of the parties which evince a meeting of their minds in agreement to modify its terms upon any particular point. Insurance Co. v. Wilkinson, 13 Wall. 222, 20 L.Ed. 617; United Steel Co. v. Casey, 6 Cir., 262 F. 889; Co-operative Stores Co. v. United States Fidelity & Guaranty Co., 137 Tenn. 609, 622, 195 S.W. 177; Williston on Contracts, Rev.Ed., Vol. VI, Sec. 1828; Vol. II, Sec. 591.

■ Hotchner contends that the oral agreement even if established was invalid because it was in violation of the Ohio Statute of Frauds. It is clear, however, under the decision of the Ohio Supreme Court in Nonamaker v. Amos, 73 Ohio St. 163, 76 N.E. 949, 4 L.R.A.,N.S., 980, 112 Am.St. Rep. 708, 4 Ann.Cas. 170, that even if the written agreement between the parties fell within the Statute of Frauds, the oral modification fell without it, for the reason that it fixed no definite period for its performance and was susceptible of being performed within the year. See Schofield v. John R. Thompson Co., 6 Cir., 109 F.2d 432, 433; and Hayes Mfg. Co. v. McCauley, 6 Cir., 140 F.2d 187, 190.

Hotchner contends that Exhibit B, admittedly executed after the oral agreement, repudiates the contention that there was a modification. Exhibit B was executed on April 30, 1940. There was evidence in Kamin's letter that the modification was in April 1940. Hotchner's own testimony discloses that it may have been in May. However, the Master found that the agreement was made shortly prior to May 1940, with the abbreviated statements to begin with that of May 1940. But Exhibit B did not state that the Statements were to be "mailed" to Hotchner, although it expressly indicated that summaries were to be "mailed" to Montroy. Exhibit A had provided the Statements would be "mailed" to Hotchner. The omission in Exhibit B

is significant. Moreover, the language of Exhibit C, executed November 17, 1941, carries the inference in Sec. 2(d) that *abbreviated* statements were being sent to Hotchner. This language was: "Separate statements in writing are to be made covering signs made hereunder listing the same as 'Pictorial' and *giving sufficient information to enable me to identify the type and quantity of such signs.*" (Italics ours.)

Hotchner claimed further that he was denied access to the office records, in violation of Article V of Exhibit A. Howenstine, secretary-treasurer of Neon, testified to the contrary:

"He made demand for these statements about December 1941, and I told him he could look at them but could not take them out of the office, I never refused him the right to look at these statements."

At another point he testified:

"Hotchner however did have the right and privilege, which was always extended to him, of examining the records at any time he indicated."

Kamin testified:

"We never refused to let Hotchner look at the detailed statements but we refused to let him have them. That was our agreement."

Mrs. Souders, billing clerk for Neon until January 1942, testified:

"Hotchner was in and out, I saw him at times talking with Mrs. Hastings" (deceased bookkeeper) "about his statements. * * * I know that he has conversed with her about statements; and I have asked Miriam, after he was through conversing, if there was anything wrong. She said no there was not. I would want to know it because I was allocating royalties on the invoices. I know there was no dissatisfaction because she told me that when I visited her in the hospital."

There is no corroborative evidence to support Hotchner's contention that he was refused access to the statements. The testimony of both Howenstine and Kamin, together with Kamin's letter, are to the contrary, and the fact that an audit was made carries a contrary inference. Mrs. Souders testified that when Huffman, the accountant, came to make the audit, " * * * he came in and introduced himself to Mr. Kamin and Mr. Howenstine. I was instructed by them to show him all records and to give him any records he asked for and to help him in any way I could. * * * Then Mr. Huffman asked me to tell him just what procedure we used on our orders. * * * Mr. Huffman looked this system all over. He praised the system very highly, said it was a very complete system. * * *"

 From the evidence we cannot say that the Master's "Finding", confirmed by the District Judge, that Hotchner "was not refused access to the detailed statements" was "clearly erroneous." See Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

We think that the evidence supports the finding. There was evidence that Neon held the statements *for Hotchner;* that he was not denied access to the detailed statements and frequented Neon's offices and talked over the statements with the bookkeeper; and that he sent to the offices his own "accredited representative". We are pointed to no reason why the cost of the audit should be charged to Neon.

 Nor was damage shown to result to Hotchner from omissions in answer to questions propounded in Hotchner's interrogatories. Sales to national advertisers were listed but some 8000 other sales were omitted. However, Kamin testfied that these sales were incorporated in the sales summaries supplied to Hotchner and were found in "complete detail in the monthly statements showing the customers' names" to which Hotchner had access.

As to the second principal question, that involving the meaning of the terms, "Individually at retail" and "in quantity orders" as they appear in the contract in connection with the royalty prices established for the sale of the devices,—the evidence indicates that there were substantially 50,000 sales of devices using Hotchner patents and of these 41,357 quantity sales are unchallenged. The controversy involves 7157 signs to the sales of which Neon allocated the smaller "in quantity" royalties. Hotchner contends that these sales should

have been classed as "individually at retail" sales carrying the double royalties provided by the contract. The amount in controversy is $3975.53. These sales fall into four classes, to wit: (1) bottler sales; (2) Buick and automobile sales; (3) Federal Savings & Loan sales; and (4) "one by one sales at quantity prices."

Huffman, the accountant, testified that he made his own definition "of quantity and retail sales," that " * * * if they were ordered by large buyers for distribution to others it was a quantity sale. If they were shipped to individual users and paid for by them, they were retail sales."

Kamin testified:

" * * * even though * * * orders came in on a one-by-one basis from them" [large companies] "or their dealers, we had to consider it quantity business, because they insisted on the quantity price. * * * The only business we considered at the time Mr. Hotchner came with us, retail business was the signs or clocks we were selling through specialty salesmen."

Hotchner's "understanding was that quantity sales would be to national accounts who would buy signs and distribute them to their various outlets."

J. G. Arnold, a salesman for Neon from 1934 through 1941, said, "I know of no usage or custom of the trade as to the meaning of quantity or retail sales," although he himself thought it would be a retail sale when the user ordered it shipped and remitted to the manufacturer, even though he bought it as a dealer on the recommendation of his distributor.

Owens, another salesman of Neon, testified:

"We quoted Buick sales on the basis of the quantity price for 100 signs and took the gamble on it. They did not guarantee to pay."

These quotations indicate the varied viewpoints as to the meaning of the disputed terms.

Hotchner in the brief admits "that there was * * * some ambiguity in the provisions of this contract in that there was no indication as to what quantity should be considered a quantity sale", particularly in

"bottler sales" and concedes that the Master was justified in hearing evidence upon that point. He insists, however, that the Master went too far in admitting extraneous evidence which changed the "obvious meaning" of the words as they applied to the other three classifications of sales. In an effort to arrive at their meaning the Master examined dictionary definitions and consulted treatises on Wholesale and Retail Trade and concluded that Neon's mode of business was such that what the parties had in mind as to what sales were "in quantity" or "individually at retail" could not be determined by the application of definitions.

We conclude that the Master was fully justified in resorting to extraneous evidence as to their meaning and that the extent of his investigation was not beyond judicial discretion. His duty was to determine the meaning of the terms when considered in the light of the situation of the parties and the purposes and subject matter of the contract. Canadian Nat. Ry. Co. et al. v. George M. Jones Co., 6 Cir., 27 F.2d 240, 242; Hurin v. Electric Vacuum Cleaner Co., 6 Cir., 298 F. 76, 77; Corbett v. Winston Elkhorn Coal Co., 6 Cir., 296 F. 577, 579.

After extensive hearings, with testimony from Hotchner, Huffman and a number of officials and employees of Neon, the Master found, " * * * that the claim of the plaintiff as to the meaning of the words 'sold in quantity order' and 'sold individually at retail' in the contract had not been established by the preponderance of the evidence and that the preponderance is in favor of the construction given to those terms by the defendant."

As is usual in cases of this character, there are conflicts in the testimony of the witnesses, whom the Master saw and heard, but there is convincing evidence to support Neon's view regarding the four disputed categories. The construction of the terms involved adopted by the Master and confirmed by the court is a reasonable one and we see no reason for rejecting it. We do not extend this opinion with a review of the evidence in detail. A few excerpts will be sufficient.

Kamin testified:

"We were forced to sell signs against competition which meant we sometimes took orders at prices that were too low. Some companies would buy one hundred or one thousand signs for immediate shipment which was fine. * * * Other companies would not make a commitment for any signs but if we could get them to approve the sign we could sell a lot of them to their dealers but we had to give them a quantity price. We were selling bottlers signs * * * and we considered it quantity, also to jobbers and wholesalers.

"The only business we considered retail business when Hotchner came with us, were sold through specialty salesmen. * * * This was also explained to Hotchner and he was satisfied with it."

Owens testified:

" * * * I sell nothing but quantity. By retail I mean one sign, store to store, to carry along, sell to the grocer, baker, etc. By quantity I mean to a national advertiser who has dealer organization whether he buys one sign or a thousand signs. * * * Firms like Buick, Oldsmobile, Chrysler * * * were nothing but quantity buyers. * * * I don't believe there were any sales to Buick, except possibly a sample * * * Ex. 39 is Oldsmobile. We never had any success there. They said, 'Circularize our dealers. We will O.K. that if they will buy it.' We printed this literature at our expense and sent it to Oldsmobile, who in turn distributed it to their various dealers and recommended the purchase. We gave them the quantity price, and the orders came from the dealers directly to us with their check attached and we shipped direct to the dealers."

Mrs. Souders, the billing clerk who took her instructions from Kamin, testified: "Any prospective buyer for any number over one would be a quantity sale."

With respect to the conversations with Hotchner in the preliminary negotiations, Howenstine testified:

"I pointed out that we had several distinct types of quantity sales * * * that we were building numerous speculative samples to interest national accounts * * * who had a tremendous number of sales outlets, into buying our signs * * * that this was a preliminary step * * * and that we would not consider any sale resulting from the construction of such a speculative sample as a quantity sale.

"I also pointed out that we were doing business with quite a few concerns who made a point of buying our signs for resale. These would be purchased maybe one today, two tomorrow, and six the next day; in varying quantities; * * * sometimes they would be shipped to the distributor's customer. Often times we would effect the collection. * * * Q. What did Mr. Hotchner say to that? A. To my recollection I was making a statement of fact, that was our way of doing business; and Mr. Hotchner acknowledged it as a fact, and stated that such being the case, we should go on and continue business in that manner."

Relative to the bottlers, Kamin testified as to Coca Cola, they were " * * * the same bottlers we sold signs to before Mr. Hotchner came with us * * * he was informed about them. Mr. Hotchner told us to go ahead and sell them on the same basis, and we went ahead and sold them on the same basis, at quantity prices."

Prior to the preliminary contract of March 1939, Kamin testified:

" * * * it was my endeavor to acquaint fully Mr. Hotchner with our business. * * * Mr. Hotchner made the statement in substance, 'I am satisfied you can do a good job for us. Go ahead on the same basis as your quantity buyers, your retail setup; * * * '"

Kamin further testified, "I do know there was no question whatsoever about the royalty, or which were quantity signs and which were retail signs."

We find no reversible error in the decree appealed from and it is accordingly affirmed.