LAIRD NORTON YARDS v. CITY OF ROCHESTER.[1]

February 9, 1912.

Nos. 17,366—(210).

**Invalid contract — part performance — recovery of reasonable value.**

Owing to informalities, a contract attempted to be made between plaintiff and defendant, a city under a home rule charter, was invalid. Thereunder coal was delivered by plaintiff to the city electric light plant for three months, and the coal consumed as delivered. *Held* that, the attempted contract being within the power of the defendant to make, plaintiff, upon the pleading and proof, was entitled to recover upon a quantum valebant for the coal received and consumed by the city.

**Complaint — evidence.**

The complaint having declared on both an express and implied contract, no election being required at the trial, and evidence being received as to the reasonable value without valid objection, the court erred in restricting plaintiff's right to recover to the express contract pleaded.

**Municipal corporation — home rule charter.**

Provisions in home rule charters of cities may not be construed so as to abrogate well-established equitable doctrines as applied to quasi municipal business transacted by such cities.

Action in the district court for Olmsted county to recover $7,531.-14, balance alleged to be due upon the purchase price of a quantity of coal. The substance of the pleadings is stated in the opinion (page 118). The case was tried before Snow, J., who made findings substantially as stated in the opinion and as conclusion of law or-

[1] Reported in 134 N. W. 644.

dered judgment in favor of defendant. From the judgment entered pursuant to the order, plaintiff appealed. Remanded with direction to the court to amend the conclusions of law so that plaintiff have judgment for the amount demanded.

*Brown, Abbott & Somsen* and *Callaghan & Granger,* for appellant.
*P. J. Scanlon* and *Henry O. Christensen,* for respondent.

HOLT, J.

The city of Rochester in 1904 adopted a home rule charter, under chapter 238, p. 349, Laws of 1903. The city is governed by a mayor and common council. It owns and operates a city electric light plant, which is managed and controlled by a public utility board of three members, whose duties are prescribed by the charter. All supplies for the light plant shall be contracted for by the public utility board in the name of the city, but any contract involving the expenditure of more than $200 from the city treasury must first be authorized by the mayor and common council before the public utility board shall have any right to act thereon. When so authorized, the contract must be let to the lowest responsible bidder. The only utility at the present time intrusted to the board is the city electric light plant. Power is given the board to make and enforce necessary rules for the operation and management of the plant, and to fix and maintain the rent rates for light furnished by it, so that the public utility fund of the city shall, so far as possible, in each fiscal year, be sufficient to defray the cost of operation, maintenance, and extension of the plant, and to pay interest on bonds of the city issued on account thereof, and to maintain a reasonable reserve fund for use in making repairs and extensions. All bills against the city on account of the plant shall be verified by the claimant and audited by the board, then transmitted to the city clerk, who shall draw orders upon the city treasury, payable out of the public utility fund, for the amount, and the orders shall be signed by the mayor and attested by the city clerk.

Whenever it is necessary for the council or utility board to procure commodities or services for the city in excess of $200, an officer or

other person shall be designated to estimate and determine the cost thereof; and, before advertising for bids, detailed plans and specifications for the proposed contract for commodities shall be filed with the clerk.  There are found requirements that a certified check of ten per cent of the total bid shall accompany the bid; that bids shall be opened at a designated time and place; if the lowest responsible bid is more than the estimated cost, new bids may be called for; that after acceptance of a bid the contract shall be executed in accordance therewith, and the plans and specifications.  Before any contract is made for furnishing "material or commodities" for any purpose, the contractor thereof "shall enter into a bond" for the use and benefit of the city and others.  Such bond shall be prepared by the city attorney, approved by the mayor, and filed in office of the city clerk. A further provision (section 287, c. 15), which relates to contracts of the city, or any department or board thereof, reads:

"Any contract made in violation of the provisions of [this] chapter shall be absolutely void, and any money paid on account of such contract by the city, or any department or officer thereof, may be recovered by the city without restitution of the property or the benefit received or obtained by the city thereunder."

On October 10, 1910, the public utility board needed a supply of coal for the plant, and in a meeting of the board then held this motion was carried: "That the secretary be and is instructed to advertise for 6,000 tons of good steam coal, three inches and over, said coal to be delivered in such quantities as may be ordered from time to time during the ensuing year.  Bidders must furnish analysis showing the Com. B. T. U. of coal offered, said coal to be delivered in the bin at the city lighting plant according to the city scale weight, or f. o. b. Rochester, Minn."  No estimate of the cost of the coal was made, nor specifications filed, as the charter required.  Bids were advertised for in substantially the same language; but in the advertisement certified checks to the amount of five per cent, instead of ten per cent, of the bid, as required in the charter, were called for.

Plaintiff tendered two bids—one for 6,000 tons to be furnished between October 24, 1910, and March 31, 1912, of Wilmington big

chunk at $4.05 per ton delivered at the plant, city scale weight, stating "Analysis of the above coal shows 12,145 B. T. U. per pound of commercial coal" (refers to the steam-making quality of the coal); and one bid to furnish 6,000 tons West Virginia splint coal at $4.50 per ton, the analysis of the coal being 13,500 B. T. U. per pound of commercial coal.

After the bids were opened the utility board adopted the motion: "That coal contract of 6,000 tons of steam coal be awarded Laird Norton Yards, subject to council's approval. Wilmington lump coal at $4.05, and with option of having West Virginia splint stored in yard for use in case of shortage." The same evening the president of the utility board appeared at the regular meeting of the council and reported verbally the bids and the board's action, subject to the council's approval, whereupon the council adopted the resolution: "Be and it is hereby resolved by the common council of the city of Rochester that the public utility board of said city be and it is hereby authorized to enter into a contract for the furnishing to said board 6,000 tons of steam coal for use in the electric light plant." November 2, 1910, the board adopted a motion: "That Laird Norton Yards furnish 600 tons immediate delivery of Virginia splint at $4.50, to be piled in yards to be used in case of car shortage during winter, and 5,400 tons of Wilmington to be delivered from time to time as needed at plant at $4.05 bin."

A contract was thereupon drawn up, whereby plaintiff agreed to sell and deliver to the city at the electric light plant 5,400 tons of Wilmington big chunk and 600 tons of West Virginia splint coal for the price bid. The contract was signed for the city by the mayor and city clerk. The plaintiff erased these words from the contract: "This coal shall show upon analysis 12,145 B. T. U. per pound of commercial coal," and "this coal shall show upon analysis 13,500 B. T. U. per pound of commercial coal," and thereupon signed and returned it to the board. Neither the board nor the council approved the contract, as altered; but it was retained in the files of the board. A bond to secure the performance of the contract was executed by plaintiff December 19, 1910, and delivered to the board, and was retained without objection, but was never approved by the mayor.

Plaintiff began to deliver coal ostensibly under the contract in November, and continued up to and including January, 1911, delivering in all 1,234⅘ tons of Wilmington big chunk and 622.01 tons of West Virginia splint, and all had been consumed at the plant before this action was begun. No payment was made, except $371.-77, paid January 10, 1911. March 22, 1911, the utility board, upon bills presented by plaintiff, ordered $7,531.14 to be paid in three separate sums. These bills were transmitted to the city clerk, who drew orders therefor on the city treasurer, payable to plaintiff, but the mayor refused to sign.

Plaintiff then brought this action, declaring both upon an express and implied contract. The defendant answered by way of denial, and also alleging the invalidity of the contract and that the city had exceeded its authorized indebtedness. A trial was had to the court and findings made.

The court found substantially as above stated, but more in detail, and, further, "that the amount claimed in the complaint is correct and the proper measure of plaintiff's recovery," if any should be had; also that there was more than $8,000 in the utility fund which might have been applied for purchase of coal. But in his conclusion of law judgment was ordered for the defendant, on the ground that the contract was void and that the city was not estopped from asserting its invalidity. The defense that the city had exceeded its authorized indebtedness was not sustained. From a motion denying amendment of the findings and a new trial, plaintiff appeals.

The learned trial court has, in addition to very complete findings, filed an exhaustive memorandum on the two defenses interposed, denying one and sustaining the other. While we do not coincide with the court below as to all matters found against the validity of the contract, we nevertheless conclude that in one particular, at least, there was such failure to execute a binding obligation that the court correctly ruled that no recovery can be had solely on the written contract offered in evidence. We refer to the fact that in the contract as prepared and executed by the city the plaintiff erased a material

term before signing it. As erased, it was not the contract executed by the city, nor was it in accord with the bid; and mere retention of the contract by the board with the change will not amount to a ratification by the city. Although so technical a construction may not be given to a municipal charter that a strict compliance will in certain instances call for impossibilities or absurdities, still substantial conformity must be exacted in every case.

The formalities prescribed in municipal charters as to letting contracts to the lowest bidder invite fair, open competition, and make for the protection of the taxpayers, and to that end courts are to give full force to the requirements. But a recovery in this action does not necessarily rest on the existence of a valid enforceable contract. It will be noticed that the contract attempted to be made related to a quasi municipal matter. The city owned and operated the electric light plant, not alone for municipal purposes, but also for sale to private parties, and it was designed to be self-sustaining. When a municipality embarks in enterprises outside the purely governmental, it becomes, to a certain extent, amenable to the rules of law that apply to the dealings of individuals and private corporations in like business. Audit Co. of New York v. City of Louisville, 185 Fed. 349, 107 C. C. A. 467.

Moreover, buying coal for the operation of the electric light plant and entering into contracts therefor was not only within the power of the utility board and city council, but became a duty. No doubt all parties attempted in good faith to comply with the charter and enter into a valid agreement; the facts found demonstrate that both plaintiff and the city government understood that this had been done. Plaintiff delivered the coal, the city used it, and for the light manufactured and sold, filled the city light fund, and made a part payment. The utility board has ordered payment. The sum so found due is the value of the coal had and consumed by the defendant. Can the city now be heard to deny liability as to the coal received? The attempted contract is not ultra vires in the primary sense of the term, and for that reason incapable of ratification to any extent, as is held in Borough of Henderson v. County of Sibley, 28 Minn. 515, 11

N. W. 91; City of Chaska v. Hedman, 53 Minn. 525, 55 N. W. 737, and Jackson v. Board of Education, 112 Minn. 167, 127 N. W. 569. Authorities are not wanting that where the power to make a contract is conferred, but in the attempted making thereof by a municipal corporation irregularities or noncompliance with charter provisions occurred, the contract in so far as performed may be held valid. Bell v. Kirkland, 102 Minn. 213, 113 N. W. 271, 13 L.R.A.(N.S.) 793, 120 Am. St. 621, and cases there cited; Bradley v. Village of West Duluth, 45 Minn 4, 47 N. W. 166; Moore v. Mayor, 73 N. Y. 238, 29 Am. Rep. 134; Swenson v. Village of Bird Island, 93 Minn. 336, 101 N. W. 495; City of Des Moines v. Welsbach Street Lighting Co. 188 Fed. 906, 110 C. C. A. 540.

We are, however, of the opinion that it is not necessary to determine whether or not the defendant has ratified the attempted contract in so far as plaintiff has performed. The complaint alleged both an express and implied contract. Plaintiff was not required to elect. Testimony was received without valid objection of the value of the coal delivered and used, and the finding made that, if plaintiff was entitled to recover, the amount asked for was correct. This, taken in connection with the facts found, entitles plaintiff to recover for the value of the coal delivered to, accepted, and consumed by the defendant.

We consider that the learned trial court was not warranted in holding that the case presented only the issue of the validity of an express contract. The pleadings, the evidence, and the findings of fact give plaintiff the clear legal right to recover upon quantum valebant, and the justice of the claim is so patent that no labored effort ought to be made to confine plaintiff's rights to the basis of a doubtful express contract, or to ratification as far as the attempted contract was performed. The language of Justice Mitchell in State v. McCardy, 62 Minn. 509, 64 N. W. 1133, is apt here: "In so far as the contract has been thus executed, it stands precisely as if it had been one to furnish light [coal] at the pleasure of the committee [city]." 2 Dillon, Municipal Corp. (5th Ed.) 793, 794. See City v. East St. Louis, 98 Ill. 415, 38 Am. Rep. 97.

Much stress is laid on section 287 of the charter above quoted. Any city may frame a charter; but it must be in harmony with and subject to the Constitution and laws of the state. We conceive this to mean, not only the statute law, but the common law found in the decision of courts as well. It cannot be that under the provisions of home charters municipal corporations may abrogate the common-law rule of estoppel, or other settled equitable doctrines, in the conduct of the quasi municipal enterprises into which they may embark. The section mentioned, in so far as it gives the municipality the right to recover money paid on a void contract, while permitted to retain the benefits received thereunder, must be confined to contracts ultra vires in the primary sense. And as to contracts which the city or the utility board have power to make, but in the attempted making unintentional irregularities and noncompliance with charter provisions have occurred, this section prevents a recovery thereon, or the enforcement thereof in court, and gives any taxpayer the right to enjoin its performance. It cannot, as to last-mentioned attempted contracts, abrogate established equitable doctrines, which in certain cases permit a recovery of the reasonable value of goods delivered in good faith thereunder to the municipality, and by it used for authorized and legitimate purposes.

The case cited by the court which appears to deny a right to recover on an implied contract is Leland v. School District, 77 Minn. 469, 80 N. W. 354; but it is to be observed that to no extent is a school district liable to a teacher for services unless there be a written contract, while the city, through its utility board, may lawfully buy coal every day without a written contract, provided it does not exceed $200 for each transaction. The case of Chippewa v. City of Durand, 122 Wis. 85, 99 N. W. 603, 106 Am. St. 931, also cited, was brought by a taxpayer to enjoin proceedings under a contract irregularly entered into, and after suit brought the parties went on with the work; the municipality paying money which the court held could be recovered.

The case is remanded, with direction to the court to amend the

conclusions of law, so that plaintiff have judgment for the amount demanded in the complaint.

PHILIP E. BROWN, J., being absent on account of illness, took no part.